Gaye LIVELY, Appellant,

v.

**FLEXIBLE PACKAGING ASSOCIATION, et al., Appellees.**

No. 97–CV–128.

District of Columbia Court of Appeals.

Reargued En Banc Oct. 30, 2001.
Decided Aug. 21, 2003.

Lawrence E. Eiser, with whom Thomas L. McCally, was on the brief, for appellant.

Alfred Belcuore for appellees.

Stephen Z. Chertkof, Lois G. Williams, Avis Buchanan, Susan Huhta, Carl Messineo, and Linda M. Correia, filed an amicus curiae brief for the Washington Lawyers' Committee for Civil Rights and Urban Affairs, the Partnership for Civil Justice, Inc., and the Metropolitan Washington Employment Lawyers' Association.

Before WAGNER, Chief Judge, TERRY,* STEADMAN, SCHWELB, FARRELL,* RUIZ, REID, GLICKMAN, and WASHINGTON, Associate Judges, and BELSON, Senior Judge.

REID, Associate Judge:

On June 11, 2001, this court issued an order vacating the panel decision in *Lively v. Flexible Packaging Ass'n, et al.*, 765 A.2d 954 (D.C.2001), an employment discrimination case in which the majority affirmed a trial court judgment overturning a jury verdict in favor of appellant Gaye Lively, and against appellees Flexible Packaging Association ("FPA") and Mr. Glen Braswell ("Mr. Braswell"),[1] on her claims of a sexually hostile work environment, unequal pay, retaliation for an assertion of her rights under the District of Columbia Human Rights Act ("DCHRA"), and intentional infliction of emotional distress. *See Lively v. Flexible Packaging Ass'n, et al.*, 773 A.2d 1033 (D.C.2001).[2] After the en banc oral argument on October 30, 2001, we held the case in abeyance pending the Supreme Court's decision in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). After *Morgan* was decided, we

---

* Judges Terry and Farrell heard the argument on tape.

1. Mr. Braswell died while this appeal was under consideration.

2. An amended order was issued on June 22, 2001.

asked the parties to file supplemental briefs discussing its impact on Ms. Lively's case.

We hold that Ms. Lively filed her hostile work environment claim in a timely manner and that a reasonable person, viewing the evidence in the light most favorable to her, could reach a verdict in her favor. Therefore, as to that claim, we reverse the trial court's grant of judgment notwithstanding the verdict in favor of appellees, and remand that claim to the trial court with instructions to (1) reinstate the jury's liability verdict and the compensatory damages award attached to that claim, and (2) consider the reasonableness of the punitive damages award in a manner consistent with this opinion. We also adopt, for cases filed under the DCHRA, the Supreme Court's hostile work environment analysis governing federal civil rights claims as it is set forth in *Morgan, supra*, and reaffirm the legal principles relating to a hostile work environment claim that we articulated in *Daka, Inc. v. Breiner*, 711 A.2d 86 (D.C.1998).[3]

## FACTUAL SUMMARY

The record before us shows that Ms. Lively began her employment at FPA in 1980, while Richard Lillquist was President of the association.[4] She was hired initially as a secretary, was promoted in 1981 to Assistant to the President, and received promotions in 1982 and 1983, respectively as Meetings Manager, and Director of Administration and Meetings. All of her performance ratings were "positive" and "above average"; and resulted in pay increases. There were no problems with the work environment. In fact, Sheron Edward Weary, who testified for Ms. Lively and who was employed at FPA from 1981 to 1992, described the environment under Mr. Lillquist as "[a] normal business-type of atmosphere."

Mr. Lillquist left FPA in 1985, and on March 1, 1986, FPA selected Glen Braswell as President. Beginning in or around 1986/1987, Mr. Braswell, and Richard Thornburg, who was hired by Mr. Braswell in 1987 as Director of Government Relations, began to make comments about females within the hearing of FPA's female employees. Mr. Weary indicated that these comments did not occur "routinely or every day," but "periodically during the time that [he] was there." According to Ms. Lively's testimony at trial, however, after the arrival of Mr. Thornburg, he and Mr. Braswell referred to women as "bimbos," "hookers and prostitutes and old maids and dykes and girls ... [o]n a daily basis."[5] They also focused on women's breasts and buttocks, referring to them as "boobs" and "asses."

In or around 1987, Mr. Braswell and Mr. Thornburg were involved in certain incidents concerning female employees at

---

3. We did not include Ms. Lively's unequal pay claim in our order regarding rehearing en banc, but did include her retaliation and intentional infliction of emotional distress claims. Because we conclude that we improvidently granted rehearing en banc as to those two claims, we vacate that portion of our order, and reinstate the opinions of the division concerning the retaliation and intentional infliction of emotional distress claims.

4. Prior to joining FPA, Ms. Lively had been employed by the FBI from 1964 to 1969, in a job related to the training of agents to read fingerprint documents; the International Union of Operating Engineers as a secretary from 1969 to 1971; the Airline Pilots Association from 1971 to 1974, as a secretary; and the American Can Company, from 1974 to 1980, first as a secretary and then as office manager.

5. Ms. Marjina Kaplan, another female FPA employee, heard the words "bimbos, broads, boobs" "pretty often[;] daily, probably."

FPA. Around January 1987, Marjina Kaplan was hired as a consultant at FPA, and became Director of Marketing and Communications in August 1987. Sometime in the fall of 1987, Mr. Braswell called Ms. Kaplan and asked her to arrange for a male stripper for Ms. Lively's birthday. He instructed Ms. Kaplan to "use [her] own personal credit card to pay for [the stripper]" and informed her "that FPA would reimburse [her] ...." On her birthday, Mr. Braswell called Ms. Lively into his office, told her to sit in his overstuffed reading chair; the male stripper moved to the front of the chair and "disrobed down to nothing but a G-string...." Ms. Lively became "really red in the face." She "was pinned into the chair" with the stripper "straddl[ing it]." Mr. Braswell "took pictures of the male stripper" and "laughed." [6] Some of the women who had gathered in the doorway "just turned and walked away ...." Mr. Weary described "feeling ... nervous" about the incident because women were present. He noted that Ms. Lively "initially ... [was] good humored about the [stripper]," as were others, but that when he observed her "a couple of times, ... she looked kind of stricken ..., like she was cornered and wasn't sure what was going on ...." [7]

Another incident took place in mid-December 1987 while Mr. Braswell, Mr. Thornburg, Ms. Lively, Ms. Kaplan and two other FPA employees, Lisa Greig and Cindy Daneker Gray, were in Houston, Texas on FPA business. The incident was memorialized by Ms. Kaplan in a file memorandum, dated December 29, 1987. Ms. Kaplan was seated next to Mr. Thornburg in "a limousine [that] had been hired to transport [FPA] staff [and their host, Jeff Siebenaller] to various points around Houston." While Ms. Lively was stepping into the limousine, Mr. Thornburg "pulled her into the car, urging her to sit on his lap because, he said, he wanted to 'look down [Ms. Lively's] cleavage.' " During the same trip, when Ms. Kaplan suggested that she did not want to go to a disco after dinner, and would rather return to the hotel, Mr. Thornburg told her: "If you value your career, you'll go along [to the disco]." Mr. Siebenaller told the women who were on the Houston trip that "he found [Mr. Thornburg's remarks to be] unprofessional and objectionable." He indicated that he planned to call Mr. Braswell within a few days "to express his negative reaction to [Mr. Thornburg's] language." [8]

Ms. Lively received complaints from Ms. Greig and Ms. Gray in October 1987, in

---

**6.** Mr. Braswell "asked [Ms. Lively] not to show [the pictures of the stripper] to anyone because he would be fired if [members of the association found out that they existed]."

**7.** Ms. Lively acknowledged that earlier in 1987, she and other employees had hired a "dancer" who "was dressed like a genie" in sheer material with satin underneath for Mr. Braswell's birthday. The dancer sang Happy Birthday to Mr. Braswell, but did not undress. Mr. Weary described the dancer as a "belly dancer" who "was provocative" and that, in contrast, "the stripper was much more on the crude side and he went a lot further than [Mr. Weary] had taste for."

**8.** Ms. Kaplan's December 29, 1987 memorandum mentioned complaints made by Ms. Greig and Ms. Gray about comments and actions by Mr. Thornburg. He once summoned Ms. Greig to his office in September 1987 by saying, "get your buns in here." Earlier, he remarked that "he enjoyed following [Ms. Greig] down the hallway so he could watch her walk." Although she was engaged at the time, in mid-October 1987, Mr. Thornburg spent time "flirting" with Ms. Gray. In November 1987, Mr. Thornburg "told [Ms. Gray] he thought she was 'a hunk of a woman' and that he 'hoped her boyfriend knew how lucky he was to be getting such a hunk of a woman." Ms. Lively's trial testimony also mentioned these remarks.

her capacity as Director of Administration and Meetings. She communicated the complaints to Mr. Braswell who instructed her to relay them to Mr. Thornburg. Mr. Thornburg initially denied the accuracy of the complaints, but then told Ms. Lively: "I will not do it again." On December 18, 1987, following the Houston trip, Ms. Kaplan also conveyed Ms. Greig's and Ms. Gray's complaints to Mr. Braswell. She alerted him to Mr. Siebenaller's plan to call him about Mr. Thornburg's behavior. Mr. Braswell became angry, and according to Ms. Kaplan, "things began to change after that."

Prior to reporting the complaints to him, Ms. Kaplan had received favorable oral comments from Mr. Braswell in 1987 about her work performance. Mr. Braswell provided written evaluations of Ms. Lively in June and again in December 1987. He wrote in June 1987: "I view your performance during the last 12 months as cooperative, productive and totally dedicated to the performance of your duties." The evaluation for December 1987 reflects Mr. Braswell's assessment of Ms. Lively's "overall writing, speaking, and listening abilities" as "developed."

Other than the use of offensive language about women, the record evidences no remarkable incidents involving Ms. Lively and other FPA female employees, and Mr. Braswell and Mr. Thornburg in 1988, although the impact of the 1987 complaints by Ms. Kaplan and Ms. Lively materialized around December 1988, at the time yearly performance ratings were due.[9] For the year 1988, Mr. Braswell generally described Ms. Kaplan's communication skills as "below standard" or "unacceptable." Her overall performance rating was "below standard." He rated eight tasks performed by her in four different areas of communications. One task was rated as "effective," two as "below standard," and five as "unacceptable." Yet, as in 1987, in the "skills evaluation" section of the rating form, he rated her communications skills ("overall writing, speaking, listening abilities") as "well developed." On the "overall evaluation" section of the 1988 rating form, Mr. Braswell marked the box "below standard." In the "additional comments" section of the overall evaluation section, Mr. Braswell wrote that Ms. Kaplan "has been a source of staff disruption and discontent on several occasions both within and without her department, i.e., (1) Reported to President [of FPA] allegations of sexual harassment of members of her department and others by another FPA staff member. Subsequent investigation found charge to be unfounded . . . ." [10]

Ms. Kaplan wrote a letter of complaint to the FPA Board, rebutting her negative performance evaluation. Similar to his evaluation of Ms. Kaplan, Mr. Braswell criticized Ms. Lively's writing, speaking, and listening communication skills in 1988, characterizing them with the words: "needs development."

By 1989, the FPA Board had become aware of the accusations against Mr. Bras-

9. Two females were hired in 1988, Courtney Logsdon in March, and Melanie Gness in December 1988. Ms. Logsdon left FPA after approximately five years, and Ms. Gness in March 1990. Both described negative comments that Mr. Braswell made about women (calling them "bimbos," and using "preggers" for pregnant women), but neither woman testified as to the year in which the comments were made.

10. Ms. Kaplan resigned in December 1988. Her June 15, 1994, affidavit contains the following statement: "In his evaluation of me, [Mr. Braswell] wrote blatant falsehoods which had no basis in fact and, were, in truth, a continuation of his campaign to make it impossible for me to continue in my employment at FPA. He successfully forced me out of my position in December 1988."

well. On January 9, 1989, the Compensation and Personnel Committee met with Mr. Braswell. The Committee Chairman, David E. McFarlane, read his written statement to Mr. Braswell, which included the following:

> Needless to say, or perhaps it does require saying, too much of our time has been spent agonizing over events and situations you have created. To name just two that have affected me—the "whores and hookers" comment to staff prior to the last annual meeting put a damper on that meeting for me and the staff. The telephone calls from [Ms. Kaplan] and others just prior to Christmas concerning her resignation and other internal affairs ha[ve] caused me considerable worry during a season that is supposed to be festive.

Mr. McFarlane added a specific comment relating to Mr. Braswell's handling of complaints by female employees:

> Another point I want to speak of is a personal perception. You are a chauvinist. You appear to have a tendency to demean women and their abilities, at the same time advancing and promoting the career of [Mr.] Thornburg. While I do not want to debate the sexual overtones (harassment?) attributed to [Mr. Thornburg], I feel the charges were true and your handling of the situation with a "trial" is a ludicrous management style. While you *are* a lawyer, you should not have trials to discuss a staff problem with yourself as the jury *and* judge. As the judge and boss you can ruin the career of an "unfriendly" witness. *I* certainly would disclaim harassment if *my* job were on the line.

Ms. Gness described the atmosphere at FPA which confirmed the presence of a demeaning attitude toward women, in which women's abilities were questioned: "Women were referred to as bimbos. It was sort of entities without any real substance, airheads." And, in her June 15, 1994 affidavit, Ms. Kaplan declared that "[Mr.] Braswell ma[d]e inappropriate and demeaning comments about and to women employees on a regular basis." She indicated that "[h]e also gave [her] vague and confusing tasks which he never intended for [her] to complete and for the purpose of criticizing [her] when they were not done."

Following his January 9, 1989, meeting with the Compensation and Personnel Committee of the FPA Board, an angry Mr. Braswell instructed FPA employees not to make any complaints directly to the Board without first bringing them to him, and accused Ms. Lively not only of reporting him to the FPA Board, but also of being a "liar." Ms. Lively engaged an attorney who sent a letter on February 21, 1989 to Malcolm McArthur, FPA's legal counsel, with a copy to the chairman of FPA's Board, Andrew Levy.[11] Later, a meeting took place between FPA's counsel, Ms. Lively and her counsel, and two other FPA employees. Also, in early 1989, the FPA Board sent Mr. Braswell to the Farr Institute for management and communications training.

Ms. Lively recalled no "inappropriate, offensive statement" made directly to her by Mr. Braswell in 1989. Nor did she remember Mr. Thornburg "mak[ing] any inappropriate, discriminatory, harassing or abusive comments directly to [her]" in

---

11. The letter referenced Ms. Kaplan's resignation and performance evaluation (including the reference to "alleged sexual harassment complaints"), Mr. Braswell's accusation that employees who called FPA Board members were liars, criticized Mr. Braswell's management of FPA's staff, and mentioned "some major problems going on at [FPA] which ... caused the staff to seek counsel."

1989. Both men, however, were "making offensive comments of a sexual nature in the office for the year[ ] 1989...." Moreover, while Ms. Lively's 1989 performance evaluation had negative aspects, especially in the "overall writing, speaking and listening abilities" category, it was not as negative as Mr. Braswell's 1988 evaluation of her.

Ms. Gness, who had been hired in 1988 by FPA, remembered that pregnant female employees at FPA were called "preggers," and women were referred to as "bimbos." She also recalled an incident when she traveled with Mr. Braswell and Mr. Thornburg to an annual meeting of state legislators. While they were in a bar at the end of the day, both men "were flirting with the waitress" whose name was Bambi, and began to joke and laugh about a lingerie show that was scheduled to commence within one hour. Ms. Gness felt uncomfortable and left. During 1990, the FPA Board, which had continued to monitor the administration of the organization, received a complaint from Ms. Gness after she was given a negative performance evaluation by Mr. Braswell in 1990. Mr. Braswell criticized her writing ability, even though her work was "frequently recognized in [FPA's] monthly newsletters," and she had been a newspaper reporter prior to commencing work at FPA. Ms. Gness resigned from FPA in March or April 1990. Similar to Ms. Gness' evaluation, Mr. Braswell also criticized Ms. Lively's writing skills in 1990.[12]

On August 8, 1990, the President of FPA, then John R. Woolford, Jr., sent a letter to Mr. Braswell, stating in part:

Let me go right to the point. There is a perception that Gaye Lively is being painted unfairly into a corner and some senior members of the association are unhappy about it . . . .

The second perception is that you are overly quick to defend [Mr. Thornburg].

In his deposition and trial testimony, Michael McNamara, an FPA Board member, and Chairman of the Board in 1992, acknowledged that "back in 1990[,] [Mr. Woolford] had put specific restrictions on Mr. Braswell in his treatment of [Ms.] Lively," and had indicated that Mr. Braswell "was not to be critical of her." During Mr. Braswell's trial testimony, he was asked: "As a result of Mr. Woolford's concerns as Chairman of the Board of FPA, he placed a specific restriction on you not to discipline or criticize Ms. Lively; correct?" Mr. Braswell responded: "That is correct." Moreover, in August 1990, Mr. McNamara and another Board member, Jerry West, met with Mr. Braswell to discuss the situation with Ms. Lively, and Mr. Braswell's management style. Personnel issues also were discussed with Mr. Braswell in Fall 1990, when Mr. Braswell "apologized" and "thanked [Mr.] Woolford and [Mr.] West for their assistance and said 'This will not happen again.'" In January 1991, Mr. Woolford wrote a memorandum to the FPA files documenting his conversations with Mr. Braswell and his "management style." He ended the memo by writing:

There have been no re-occurrences of personnel issues in the fourth quarter of 1990. I am not naive enough to feel the one session with Farr Associates changed [Mr. Braswell's] basic management style. However, I do feel he is trying to be a better manager and he is aware of the problem he will have if he runs 'wild' again.

12. Ms. Gness testified that when she was in the office and off travel for FPA, she interacted on a daily basis with Ms. Lively and did not see any problems with Ms. Lively's writing, or her oral communication skills.

Ms. Lively did not encounter any direct discriminatory, harassing or abusive comments or conduct from either Mr. Braswell or Mr. Thornburg in 1991. She sustained a hip injury at work in November 1991 when she bumped into the corner of a desk while renovation work was underway, but continued to work at FPA.

In 1992, around March, Mr. McNamara became Chairman of the Board. In addition, around May or June 1992, Mr. West, in his capacity as Chairman of the Personnel Committee, removed the restriction on Mr. Braswell's criticism of Ms. Lively.

Comments with sexual overtones were made by Mr. Thornburg and Mr. Braswell in 1992, shortly before and after the restriction on Mr. Braswell was lifted. In February 1992, while Ms. Lively "was bent down at [a] file cabinet," Mr. Thornburg said: "Lively, every time I see you, you're on your knees." When Ms. Lively responded: "No, I'm not. And what do you mean by that comment," Mr. Thornburg answered: "That's not the talk going on in the barbershop." [13]

Another incident took place within a month or two after the restriction on Mr. Braswell was removed. At a July 1992 meeting of FPA staff directors, which Mr. Braswell attended, Mr. Thornburg "made the comment that to get state legislators into [an] FPA [trade show] booth, they would just put [a female FPA employee,] Tammy [Poston] in a short skirt and put her out in the aisle, and that would bring state legislators into the booth so FPA could talk to them." In October 1992, during a meeting in Florida of twenty FPA male staff members, Mr. Braswell arrived late and sat opposite Ms. Lively. He asked Jim O'Leary, who was seated at the head of the table, and who was the chairman of a committee that worked with Ms. Lively, "[W]ere you in [Ms. Lively's] room last night conducting membership business?" Ms. Lively became "upset" because she understood Mr. Braswell's question to be, "[W]as [Mr.] O'Leary in [her] room having sex?" Also, on December 11, 1992, Ms. Lively was in the copying room when Mr. Braswell entered while a female FPA employee, Katherine Hyde, was discarding books. When Ms. Hyde "asked Mr. Braswell to help her retrieve the[ ] books," he declared: "Don't you know I've had a hernia operation and I can't help you retrieve these books? You're the dumbest girl I've ever seen." [14]

Mr. Braswell placed two letters written in October 1992 by persons outside of the FPA staff into Ms. Lively's personnel file, as examples of her alleged deficient communication skills. One of the letters came from Robert O. Kentworthy, at Mr. Braswell's request that he "reduce to writing his oral complaint ...." The other letter, from Len Levy, asked for a clarification of remarks made by Mr. Braswell at a Membership Committee meeting. In a Decem-

13. During her trial testimony, Ms. Logsdon recounted a similar incident in 1992 involving Tiffany Stalboerger, FPA's receptionist. Ms. Stalboerger "was doing some work filing or something, general work on her knees in the workroom." Mr. Thornburg "said something to the effect of, oh, you're on your knees again." When Ms. Stalboerger made a comment back to him, he retorted: "That's not what the boys in the barbershop say." Ms. Logsdon specifically recalled the incident because she "knew that [Mr. Thornburg] had said [virtually the same thing] with someone else before, ... [but she] hadn't heard it directly said before that." The women regarded comments about being on their knees as accusations of oral sexual behavior.

14. Mr. Braswell actually stated: "You're the dumbest *white* girl I've ever seen." (emphasis supplied). During a pretrial discussion of this comment, the word "white" was excluded to avoid an inference that the case also involved race.

ber 11, 1992 letter to Ms. Lively, read to her in Mr. Braswell's office in the presence of FPA's legal counsel, Mr. Braswell and Mr. McNamara wrote, in part:

> Management's perception of your deficiency in communications skills has been validated by the receipt, during 1992, of written complaints from members regarding your performance in this area. I specifically refer to the Bob Kentworthy/Tom Bryce communiques regarding unprofessional communique follow ups in membership development activities, and the Len Levy letter regarding the minutes of the Membership Committee. This is in addition to several oral comments received about your communications deficiencies, including comments from our Chairman, Mike McNamara, regarding the mis-communications during certain spouses planning meetings.

The letter noted that Ms. Lively's "performance reviews since 1988 have specifically designated [Ms. Lively's] communications skills as an area that needs development." [15] After "conclud[ing] that [Ms. Lively's] current skills do not meet the minimum levels required for Director level performance and position at FPA, ...["] the letter stated:

> We have made arrangements, at FPA expense, for you to be tested and diagnosed by the Kingsbury Center in Washington, D.C. These tests would determine your communications skills competence level versus your level of performance at FPA and recommend to you and the FPA such courses of action necessary to bring your level of performance to the level expected at FPA. We also propose that any subsequent training required would be at FPA expense.

The letter informed Ms. Lively that she would be placed on probation for six months, beginning after the completion of a "battery of diagnostics tests" at the

---

15. In June 1991, FPA hired Jane Dandelski as a staff technician for the Membership Department and the Finance and Administration Department. She became Ms. Lively's administrative assistant. In 1992, "shortly before [Ms. Lively] left for her formal medical leave," Mr. Braswell asked Ms. Dandelski to proof read correspondence sent out by Ms. Lively. Ms. Dandelski found "[n]umerous typos." She complained that Ms. Lively would "giv[e] [her] one direction one day and then chang[e] her mind the next day or maybe 2 weeks down the line." Jennifer Lee Scott, who held a college degree in elementary education and history, and was hired in July 1991 to work for Mr. Thornburg and two other FPA staff members, testified that at FPA staff meetings, when a question was asked of Ms. Lively, "[s]he would stop and would not know what to say and would stumble over an answer." In responding to a question about "Ms. Lively's ability to adequately and accurately communicate information," Ms. Scott asserted: "In general, reading letters and things that were composed by her that went out of the office, to me they were full of grammatical and spelling errors." Marjorie Valin, who was hired by FPA in February 1992, and who was Director of Public Relations and Marketing for FPA at the time of Ms. Lively's trial, "thought [Ms. Lively's] oral abilities [were] fine." Although she believed Ms. Lively's "written abilities could use some improvement," she responded, "Oh, no" to the question: "Were her written communications so bad, so wrong, so beyond the pale that in your mind, it would require psychiatric testing to see what improvements could be made?" Several former FPA employees, including Ms. Kaplan, Ms. Logsdon, and Ms. Gness gave testimony indicating that they saw no deficiencies in Ms. Lively's communications skills.

Other than those emanating from Mr. Braswell, Mr. McNamara could identify only three complaints concerning Ms. Lively's communications skills during her 12–year tenure with FPA, one of which came from his wife who "complained that Ms. Lively would not get back to her about things that women could do at the Annual Meeting."

Ms. Lively pointed out that during her 16 years of work prior to her FPA employment, none of her supervisors had ever criticized her communications skills.

Kingsbury Center, "no later than January 15, 1993." [16] The letter warned that "the diagnostic[ ] evaluations and further management review" could result in Ms. Lively's "reassign[ment] to a lower level of responsibility within the FPA, commensurate with [her] skills, both communications and otherwise, with an appropriate reduction in salary, reduced in increments over a period of time to lessen its economic effect." Ms. Lively testified that the December 11, 1992 letter "totally devastated [her]"; that she "had worked very, very hard at [FPA] and [ ] loved it." She interpreted the letter as saying, "[I]f I do not go to the Kingsbury Center, I will be terminated," and indicated that it "was totally unexpected." Her husband, Colbert Lively, described his wife's reaction to the December 11, 1992 letter, particularly the section indicating that she was required to go to the Kingsbury School for diagnostic testing: "She was just destroyed. She ... [was] crying .... [S]he did not want to talk to anybody. She ... was totally stressed out.... She took the blinds down. She did not want to see anybody ...." Ms. Lively sought psychiatric help in an effort to cope with her devastation after she received the Decem-

ber 11 letter, and after her termination. She described her reaction to these events:

I felt that I had lost everything, except my family, because FPA was my life. I had been there for 13 years when they fired me, and I was just totally devastated. I couldn't eat. I couldn't sleep. I felt paranoid. I closed the blinds. I didn't want my neighbors to see me for I was so afraid that they would think that I did have a communication problem. So, the only people that I surrounded myself with for about three or four months was immediate family, and I never want to experience that kind of feeling again. I was totally depressed. I don't ever want to go through that again.

Following December 11, 1992, Ms. Lively worked from home due to recuperation from her November 1992 hip surgery, resulting from her November 1991 hip injury. While she was recuperating and working from home, Mr. Braswell sent her a letter dated January 19, 1993, postponing the beginning date of her probationary period and training until after her return to FPA, but emphasizing the necessity of diagnostic testing by a professional.[17] In

16. Although the Kingsbury Center services adults, it is known mainly as a place specializing in the learning disabilities of children. Descriptive literature contains the following explanation of the Kingsbury Center:

The Kingsbury Center is the oldest educational institution in the Washington area to address the special needs of young children, adolescents, and adults who experience learning difficulties. An independent, non-profit organization founded in 1938 by Marion Kingsbury to help children with learning disabilities achieve their potential, the Center provides services to hundreds of individuals each year. In addition, the Center operates The Kingsbury Day School, now in its ninth year, which is attended by nearly fifty elementary school-age students.

Dr. Cheryl Smith, a clinical psychologist at the Kingsbury Center, testified that 90–95% of

the Center's patients were children. She asserted that "a learning disability does involve brain dysfunction .... [I]t is some sort of a brain dysfunction."

17. Responding to Ms. Lively's January 13, 1993 letter, in which she asked to go to the Anne Arundel Community College instead of the Kingsbury Center, Mr. Braswell wrote, in part, on June 19, 1993:

It may be possible that if diagnostic testing from other sources indicates that the courses available at Anne Arundel Community College are appropriate solutions, the FPA would accept that training, recognizing the geographical convenience to you. The diagnostic testing is the key to defining the proper solution and I am not comfortable (absent third party professional determination) that simply enrolling in community college classes addresses our specific needs.

February 1993, FPA's insurance carrier terminated the workers' compensation benefits the association had been making voluntarily to Ms. Lively; the asserted reason was a belief that she had a pre-existing injury. The District of Columbia Department of Employment Services ordered that Ms. Lively be paid temporary total disability benefits retroactive to November 2, 1992.

Later, on June 11, 1993, FPA sent Ms. Lively a letter indicating that if she did not return to work by July 15, 1993, she would be fired. Ms. Lively was scheduled for more surgery on July 8, 1993. Despite her request, made through her attorney, for additional time to recover from the surgery, and to work from her home, Ms. Lively was terminated from her position at FPA on July 15, 1993, without receiving the normal severance package for FPA employees.[18] She was replaced by Mr. West who worked part-time for over one year from his home in North Carolina until the position was filled by a permanent employee.

Ms. Lively filed suit against FPA and Mr. Braswell on December 8, 1993.[19] At the close of a June 1996 trial, the jury initially returned answers to six main questions:

(1) Do you find that the defendant or defendants discriminated against plaintiff in the course of her employment by the maintenance of a hostile work environment? [Jury: yes]

If your answer is yes to Question No. 1, what amount do you feel would fairly compensate plaintiff for her damages on this claim? [Jury:] $156,600

(2) Do you find that defendant or defendants discriminated against plaintiff in the course of her employment by providing unequal pay based on gender? [Jury: yes]

If your answer is yes to Question No. 2, what amount do you feel would fairly compensate plaintiff for her damages on this claim? [Jury:] $155,135

(3) Do you find that the defendant or defendants discriminated against plaintiff by unlawfully retaliating against her for asserting her rights under the D.C. Human Rights Act? [Jury: yes]

If your answer is yes to Question No. 3, what amount do you feel would fairly compensate plaintiff for her damages on this claim? [Jury:] $91,823

(4) Do you find that an act or acts of the defendant or defendants intentionally inflicted emotional distress upon the plaintiff? [Jury: yes]

If your answer is yes to Question No. 4, what amount do you feel would fairly compensate plaintiff for her damages on this claim? [Jury:] $54,600

(5) Do you find that an act or acts of defendant Braswell were malicious or in

---

Therefore, the FPA still feels that the first step in addressing this matter is the diagnostic testing offered by the Kingsbury Center As I mentioned to you in our December 11th meeting, if there are other sources available for diagnostic testing that you prefer, FPA would be happy to consider them as long as they are as professionally competent as the Kingsbury Center.

18. Ms. Lively's full salary was paid through April 30, 1993, after which she received long term disability payments.

19. Ms. Lively's complaint contained the following counts: (1) discrimination in the course of employment on the basis of sex; (2) discrimination in the termination of employment on the basis of sex; (3) discrimination in the termination of employment on the basis of physical handicap; (4) intentional infliction of emotional distress; (5) unlawful retaliation; and (6) wrongful termination of employment. Her demand for relief included compensatory and punitive damages.

willful, wanton or reckless disregard of plaintiff's rights? [Jury: yes]

(6) Do you find that an act or acts of defendant Flexible Packaging Association were malicious or in willful, wanton or reckless disregard of plaintiff's rights? [Jury: yes]

Later, after hearing testimony from Mr. Braswell and an accountant for FPA concerning the net worth of each, the jury responded to two questions regarding punitive damages:

(1) What amount of punitive damages do you award in favor of Gaye Lively against Glen Braswell? [Jury:] $77,500

(2) What amount of punitive damages do you award in favor of Gaye Lively against the Flexible Packaging Association? [Jury:] $458,158

Following the jury verdicts, FPA and Mr. Braswell filed a motion for judgment as a matter of law or, in the alternative, a new trial. Ms. Lively opposed the motion, and on December 24, 1996, the trial court granted the motion. With respect to Ms. Lively's unequal pay claim, the trial court found that Ms. Lively failed to "establish[ ] that [FPA] pa[id] men and women unequally 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.' "[20] As for Ms. Lively's hostile work environment claim, the trial court concluded that: "[S]ince the incidents comprising the hostile work environment claim occurred more than a year prior to the filing of the lawsuit, that claim is time-barred and should not have been submitted to the jury." The court further declared:

The court concludes that more than the December 11 incident is needed to allow plaintiff to reach back to incidents described in the testimony that occurred in 1987 and 1992 in order to preclude application of the limitation period. While insensitive and in poor taste, defendant Braswell's comment to another person, which plaintiff happened to overhear, is not necessarily an example of sexual harassment. *See Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164 (7th Cir.1996). It does not in and of itself necessarily carry a connotation of sexual discrimination.

Having thrown out the hostile work environment claim, the trial court determined that: "The kind of employment-related complaints remaining in [Ms. Lively's] claim cannot be considered 'atrocious and utterly intolerable in a civilized community,' "[21] and consequently, the intentional infliction of emotional distress "claim cannot stand." Similarly, the court asserted that Ms. Lively's retaliation claim "should not have been submitted to the jury because no reasonable juror could have concluded that [Ms. Lively] had established by a preponderance of the evidence that her termination in July 1993, was based on a reason that was a pretext." Regarding the jury's award of punitive damages, the trial court stated: "[H]aving determined that no compensatory damages are legitimately available to [Ms. Lively], it follows that punitive damages are similarly unavailable."

Finally, the court summarized its disposition of FPA's and Mr. Braswell's alternative motion for a new trial, taking into consideration the possibility that this court might disagree with its statute of limita-

---

20. *See Howard Univ. v. Best,* 484 A.2d 958, 984 (D.C.1984). This claim is not before the en banc court.

21. *Elliott v. Healthcare Corp.,* 629 A.2d 6, 9 (D.C.1993).

tions ruling relating Ms. Lively's hostile work environment claim:

> [T]he court concludes that [FPA's and Mr. Braswell's] alternative motion for a new trial should be granted in regard to the unequal pay and retaliation claims. The court further concludes that, if its resolution of the limitations issue is incorrect, there is sufficient evidence to sustain the hostile work environment and infliction of emotional distress claims. If those two claims stood alone, the alternative new trial motion would be denied. However, because the issue of punitive damages was submitted to the jury as it related to all of [Ms. Lively's] claims, and the jury's punitive damages award did not differentiate among the various claims, the court has determined that, in the event its entry of judgment in favor of [FPA and Mr. Braswell] is not sustained, the alternative motion for a new trial should be granted in its entirety, that is, with respect to all claims that were previously submitted to the jury.

Ms. Lively filed a timely appeal of the court's judgment. Mr. Braswell and FPA did not file a cross-appeal.

## ANALYSIS

Ms. Lively contends that the trial court erred in holding, after the jury's verdict, that her hostile work environment claim, filed under the District of Columbia Human Rights Act ("DCHRA"), was "time-barred" by the statute of limitations. She maintains that the one-year statute of limitations under the DCHRA did not begin to run until July 15, 1993, the date of her termination from FPA; and that even assuming that the trial court was correct in concluding that the period of limitations began to run as of December 11, 1992, it was incorrect in determining that none of the defendants' actions on or after that date satisfied the hostile work environment requirements.

FPA and Mr. Braswell agree with the trial court's analysis, and emphasize that Ms. Lively was on notice of her claim prior to December 8, 1992, and therefore "is ineligible for the 'continuing violation' exception." They argue that during the one-year period prior to her December 8, 1993 lawsuit, or what they call "the fresh period," she must show a "pertinent violation" which is of the same nature as the violations in the period prior to December 8, 1992, or "the stale period." That is, the new violation must have a "sexual component" consistent with her theory of a "sexually hostile work environment."

We begin with our standards of review for a judgment notwithstanding the verdict, and for the grant of a motion for a new trial. As we said in *Aurora Assocs., Inc. v. Bykofsky*, 750 A.2d 1242 (D.C.2000):

> "A judgment notwithstanding the verdict of the jury is appropriate only where 'no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.'" *Durphy v. Kaiser Health Plan*, 698 A.2d 459, 465 (D.C.1997) (quoting *Lyons v. Barrazotto*, 667 A.2d 314, 320 (D.C.1995) (quoting *Oxendine v. Merrell Dow Pharm., Inc.*, 506 A.2d 1100, 1103 (D.C.1986))) (citing *District of Columbia v. Cooper*, 445 A.2d 652, 655 (D.C.1982) (en banc) (other citation omitted)). Moreover, "[w]hen the case turns on disputed factual issues and credibility determinations, the case is for the jury to decide." *Id.* (citing *Lyons, supra*, 667 A.2d at 320 (other citations omitted)). "'If reasonable persons might differ, the issue should be submitted to the jury.'" *Id.* (quoting *Lyons, supra*, 667 A.2d at 320 (citation omitted)). Furthermore, "[i]n reviewing a motion for judgment as a matter of law

after a jury verdict, this court applies the same standard as the trial court." *Id.* (citing *Oxendine, supra,* 506 A.2d at 1103). " '[W]e review the denial of ... a motion [for judgment after trial] deferentially.' " *United Mine Workers of America, Int'l Union v. Moore,* 717 A.2d 332, 337 (D.C.1998) (quoting *Daka v. Breiner,* 711 A.2d 86, 96 (D.C.1998) (other citation omitted)). *Id.* at 1246. " '[T]he trial court has broad latitude in passing upon a motion for a new trial,' and we review the disposition of such a motion only for abuse of discretion." ' *United Mine Workers, supra,* 717 A.2d at 337 (quoting *Gebremdhin v. Avis Rent-A-Car Sys., Inc.,* 689 A.2d 1202, 1204 (D.C. 1997)). However, "[t]o grant a motion for a new trial, the trial court must find that the verdict is against the weight of the evidence, or that there would be a miscarriage of justice if the verdict is allowed to stand." *Id.*

### The Hostile Work Environment Claim

We turn now to the law governing a hostile work environment claim, as set forth in cases in this jurisdiction and in the Supreme Court's decision in *Morgan, supra.* We have recognized that the DCHRA "is a remedial civil rights statute that must be generously construed." *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724, 731 (D.C.2000) (citing *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 889 (D.C. 1998); *Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392, 398 (D.C.1991)). The "generous construction" principle is consistent with the legislature's approach to the DCHRA. In amending the DCHRA in 1997, the legislature emphasized its "broad scope" and the fact that its coverage is wider than Title VII:

> The District's human rights law has long been praised for its broad scope. The law bans discrimination in employment, housing, public accommodations, and education. It protects people from discrimination based on characteristics covered in federal civil rights law— race, color, sex, religion, age, national origin, and disability— as well as other characteristics not covered under federal law, such as sexual orientation, marital status, and family responsibilities.

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON GOVERNMENT OPERATIONS, COMMITTEE REPORT ON BILL 12–34, "The Human Rights Amendment Act of 1997," May 29, 1997 ("Council Report"), at 2. We have said also that the "generous construction" standard applies to the interpretation of the limitations period in the DCHRA. In *Simpson, supra,* we stated:

> [W]here two constructions as to the limitations period are possible, the courts prefer the one which gives the longer period in which to prosecute the action. *Safeco Ins. Co. of Am. v. Honeywell,* 639 P.2d 996, 1001 (Alaska 1981). "If there is any reasonable doubt in a statute of limitations problem, the [c]ourt will resolve the question in favor of the complaint standing and against the challenge." *Saunders v. Holloway Const. Co., Inc.,* 724 F.Supp. 640, 642 (W.D.Ark.1989).

*Id.,* 597 A.2d at 401.

Furthermore, we have "often looked to cases construing Title VII to aid us in construing the [DCHRA]." *Daka, Inc., supra,* 711 A.2d at 92 n. 14 (quoting *Atlantic Richfield, Co. v. District of Columbia Comm'n on Human Rights,* 515 A.2d 1095, 1103 n. 6 (D.C.1986) (citations omitted)). In that regard, our historic approach to hostile work environment cases in this jurisdiction is consistent with *Morgan* 's hostile work environment analysis under Title VII. This court first broached the possibili-

ty of a hostile work environment claim under the DCHRA, D.C.Code § 1–2501 *et seq.* (1999), recodified at D.C.Code § 2–1401.01 *et seq.* (2001),[22] in *Best, supra.* There we articulated the elements of a *prima facie* case of sexual harassment. *Best, supra,* 484 A.2d at 981. Years later, we concluded that the elements set forth in *Best* were applicable to a hostile work environment discrimination case:

> [T]he same test should apply, *mutatis mutandis,* in any DCHRA case in which a plaintiff alleges unlawful discrimination that takes the form of a hostile or abusive working environment. In other words, applying the *Best* standard more generically, a plaintiff ... has a viable hostile environment claim if [s]he can demonstrate (1) that [she] is a member of a protected class, (2) that [she] has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition or privilege of employment.

*Daka, Inc., supra,* 711 A.2d at 92 (citing *Best, supra,* 484 A.2d at 978). We further discussed in *Daka, Inc.* the type of proof required to establish a hostile work environment claim:

"More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a prima facie case." [*Best, supra,* 484 A.2d] at 980 (citations and footnote omitted). However, "no specific number of incidents, and no specific level of egregiousness" need be proved. *Id.* [at 980–81]. This means that in determining whether the DCHRA has been violated, "the trier of fact should consider ... the amount and nature of the conduct, the plaintiff's response to such conduct, and the relationship between the harassing party and the plaintiff." *Id.* at 981.

*Id.* at 93. We also incorporated in our analysis of a hostile work environment claim aspects of two Supreme Court decisions, *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) and *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986):

*Harris* and *Meritor* hold that a plaintiff in a Title VII action need not prove "a tangible psychological injury" in order to prove the existence of a hostile work environment. *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (citing *Meritor,* 477 U.S. at 64, 106 S.Ct. 2399). The rationale for this holding is that ... abusive work environments, even those that do not seriously affect an employee's emotional

---

22. D.C.Code § 2–1401.01 sets forth the local legislature's intent:

> It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, familial status, family responsibilities, matriculation, political affiliation, disability, source of income, and place of residence or business.

In addition, D.C.Code § 2–1401.11(a)(1) provides in pertinent part:

> (a) *General.*—It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the ... sex ... of any individual:
> (1) *By an employer.*—To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment; or to limit, segregate, or classify his [or her] employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his [or her] status as an employee.

well-being, "can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris*, 510 U.S. at 22, 114 S.Ct. 367. Thus a plaintiff has an actionable hostile work environment claim under Title VII "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' ...." *Id.* at 21, 114 S.Ct. 367 (quoting *Meritor,* 477 U.S. at 65, 67, 106 S.Ct. 2399). Under this standard, a plaintiff must demonstrate both an objectively hostile or abusive environment, *i.e.*, one that a reasonable person would find hostile or abusive, and a subjective perception by the plaintiff that the environment is abusive. But the plaintiff need not prove, in addition, that he or she suffered an actual psychological injury.

*Daka, Inc., supra,* 711 A.2d at 93 (footnote omitted); *see King v. Kidd,* 640 A.2d 656, 669 (1993). Our historic approach to hostile work environment claims clearly relied upon principles extracted from Supreme Court cases. We see nothing in *Morgan, supra,* or the DCHRA, that compels us to depart from such reliance. Consequently we now summarize *Morgan*'s approach to hostile work environment claims, and adopt that approach in this jurisdiction.

*Morgan, supra,* distinguished a discrete act of discrimination from a hostile work environment claim: "A discrete retaliatory or discriminatory act[, such as a 'termination, failure to promote, denial of transfer, or refusal to hire'] 'occurred' on the day that it 'happened.'" *Id.,* 536 U.S. at 110, 122 S.Ct. 2061 (emphasis in original). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 122, 122 S.Ct. 2061. More-

over, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* In contrast to a discrete discriminatory act, the "very nature [of a hostile work environment claim] involves repeated conduct." *Id.* at 123, 122 S.Ct. 2061. Moreover,

> The "unlawful employment practice" ... cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. *See Harris,* [*supra* ], 510 U.S. [at] 17, 114 S.Ct. 367[ ] ("As we pointed out in *Meritor,* [*supra* ], 477 U.S. [at] 67, 106 S.Ct. 2399[ ], 'mere utterance of an ... epithet which engenders offensive feelings in an employee,' ... does not sufficiently affect the conditions of employment to implicate Title VII"). Such claims are based on the cumulative effect of individual acts.... "[T]he phrase 'terms, conditions or privileges of employment'" [of 42 U.S.C. § 2000e–2 (a)(1) ] evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment...." Thus, "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated. *Harris,* 510 U.S., at 21, 114 S.Ct. 367 (internal citations omitted).

*Id.* at 123–24, 122 S.Ct. 2061 (other citations omitted).

*Morgan* highlights the fundamental difference between a discrete discriminatory act and a hostile work environment claim

by emphasizing both the cumulative effect of incidents comprising that claim, and its unitary nature— that is, it is one unlawful employment practice. Our case law also recognizes the uniqueness of a hostile work environment claim. Such a claim focuses on the "entire mosaic," *see Carter–Obayuwana v. Howard Univ.*, 764 A.2d 779, 794 (D.C.2001) (quoting *Tyree v. Evans*, 728 A.2d 101, 106 (D.C.1999)). The "entire mosaic" concept is consistent with *Morgan*'s emphasis on "all the circumstances," including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance," *Morgan, supra*, 536 U.S. at 124, 122 S.Ct. 2061 (citation and internal quotation marks omitted).

Thus, in adopting *Morgan*'s essential holding regarding a hostile work environment claim, we do not forge a radical departure from our historic approach to a hostile work environment claim. Rather, adoption of *Morgan* is consistent with the "generous construction" principle, extended to limitations analysis, as well as our practice of looking to federal Title VII cases in interpreting the DCHRA.

■■■ We now adopt the Supreme Court's analysis in *Morgan* and hold that, because "[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute 'one unlawful employment practice,'" *Morgan, supra*, 536 U.S. at 117, 122 S.Ct. 2061 (citation omitted), the trier of fact must focus on "all the circumstances," including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance." *Id.* at 116, 122 S.Ct. 2061 (internal citations and quotation marks omitted). Furthermore, if "an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.* at 117, 122 S.Ct. 2061. "It does not matter, for purposes of the [DCHRA], that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* Even if there are significant gaps in the occurrence of acts constituting the hostile work environment claim, the filing of that claim still may be timely because this type of "'unlawful employment practice' … cannot be said to occur on any particular day. It occurs over a series of days or perhaps years." *Id.* at 115, 122 S.Ct. 2061. We also reaffirm the basic principles governing a hostile work place claim set forth in this court's decision in *Daka, supra*, and other cases.[23]

Having adopted *Morgan*'s approach to hostile work environment claims, we turn to the statute of limitations issue. The DCHRA contains a private right of action provision which currently specifies in pertinent part:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appro-

---

23. *Morgan, supra*, had not been decided when the trial court granted appellees' motion for judgment as a matter of law following the jury verdict. Therefore, in relying on *Galloway v. General Motors Serv. Parts*, 78 F.3d 1164 (7th Cir.1996), in reaching its conclusion to reverse the jury verdict as to Ms. Lively's hostile work environment claim, the trial court could not have known that the Supreme Court would reject the hostile work environment test set forth in *Galloway*. *See Morgan, supra*, 536 U.S. at 124 n. 11, 122 S.Ct. 2061.

priate, unless such person has filed a complaint [with the District of Columbia Office of Human Rights].... No person who maintains, in a court of competent jurisdiction, any action based upon an act which would be an unlawful discriminatory practice ... may file the same complaint with the Office. A private cause of action pursuant to [the DCHRA] shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act, or the discovery thereof ...

D.C.Code § 2–1403.16(a) (2001).[24] When Ms. Lively filed her complaint in 1993, however, § 2–1403.16(a) did not contain the one-year statute of limitations.[25]

Even though the one-year statute of limitations period was not enacted by statute until 1997, our case law specified prior to that time that a private right of action must be brought within one year, in accordance with the limitation period found in D.C.Code § 1–2544 (1993). *See Davis v. Potomac Elec. Power Co.,* 449 A.2d 278, 282 (D.C.1982). In 1993, § 1–2544(a)[26] provided that: "Any complaint under this chapter shall be filed with the Office [of Human Rights] within 1 year of the occurrence of the unlawful discriminatory practice, or the discovery thereof ...." Thus, under *Davis, supra,* Ms. Lively was required to file her complaint "within 1 year of the occurrence of the unlawful discriminatory practice, or discovery thereof." *See also Brown v. Capitol Hill Club,* 425 A.2d 1309, 1311 (D.C.1981) ("The [DCHRA] provides specific timetables ... for filing a claim of discrimination: within one year of the alleged unlawful discriminatory practice or its discovery ... a complainant, seeking damages or other appropriate re-

lief, may file a complaint with [the Office of Human Rights], ... or in any court of competent jurisdiction....")

The words "or its discovery" are significant. As we interpret these words, we are guided by what we said in *Simpson, supra:* "If there is any reasonable doubt in a statute of limitations problem, the court will resolve the question in favor of the complaint standing and against the challenge." *Id.* at 401 (citations and internal quotations omitted). In general, the discovery rule was designed to extend the time during which a plaintiff may bring a suit, and not to contract it. As this court explained in *Bussineau v. President and Dirs. of Georgetown College,* 518 A.2d 423, 430 (D.C.1986), the discovery rule "is designed to prevent the accrual of a cause of action before an individual can reasonably be expected to discover that [s]he has a basis for legal redress." *Accord, East v. Graphic Arts Indus. Trust,* 718 A.2d 153, 157 (D.C.1998); *PH Sheehy Co. v. Eastern Importing & Mfg. Co.,* 44 App. D.C. 107, 109 (1915).

Consistent with the design of the discovery rule, and with *Simpson, supra,* we interpret the words "or its discovery" within the context of the unique hostile work environment claim. "A hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice,'" *Morgan, supra,* 536 U.S. at 124, 122 S.Ct. 2061 (citation and internal quotations marks omitted). Such a claim must be filed within one year of the occurrence of this unlawful employment practice. All of the component acts comprising the hostile work environment claim need not have taken place within the one-year period, *id.,*

**24.** Previously codified as D.C.Code § 1–2556(a) (1981).

**25.** The limitation period provision was added to § 2–1403.16(a) in 1997, by D.C. Law 12–

39, October 23, 1997, § 2(e). *See* Council Report, at 1.

**26.** Recodified at D.C.Code § 2–1403.04(a) (2001).

but at least one "act contributing to the claim" must occur within that period in order for the filing to be timely. Part of the uniqueness of a hostile work environment claim is that this type of unlawful employment practice "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years", *Morgan, supra,* 536 U.S. at 115, 122 S.Ct. 2061. Thus, even if there are significant gaps in the occurrence of the acts constituting the unitary hostile work environment claim, the filing of that claim still may be timely.[27] This is so because a hostile work environment claim concerns a single unlawful practice which is treated as an indivisible whole for purposes of the limitations period, even if an initial portion of that claim accrued outside the limitations period.[28]

■ We conclude that Ms. Lively's hostile work environment claim was timely filed, and that an act contributing to that claim fell within the requisite one-year period of limitation. In reaching this conclusion, we have reviewed the evidence presented to the jury in the light most favorable to Ms. Lively.[29] *Aurora Assocs., Inc. v. Bykofsky,* 750 A.2d 1242, 1246 (D.C.2000).

Ms. Lively filed her complaint, which included a hostile work environment claim, on December 8, 1993. She had to show "a series of separate acts that collectively constituted one unlawful employment practice," and that "an act contributing to the [hostile work environment] claim occurr[ed] within the filing period," *Morgan, supra,* 536 U.S. at 117, 122 S.Ct. 2061, that

27. The Supreme Court in *Morgan, supra,* provided an illustration of timely filed claims: (1) Acts on days 1–400 create a hostile work environment. The employee files the charge on day 401: Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile environment on days 1–100 and on day 401, but there are no acts between days 101–400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim. On the other hand, if an act on day 401 had no relation to the acts between days 1–100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee can not recover for the previous acts, at least not by reference to the day 401 act. *Id.*

28. Because "the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." *Id.* at 118, 122 S.Ct. 2061. Regarding damages that may be recoverable, the Supreme Court stated:

Our conclusion with respect to the incidents that may be considered for the purposes of liability is reinforced by the fact that the statute in no way bars a plaintiff from recovering damages for that portion of the hostile environment that falls outside the period for filing a timely charge. Morgan correctly notes that the timeliness requirement does not dictate the amount of recoverable damages. It is but one in a series of provisions requiring that the parties take action within specified time periods, ... none of which function as specific limitations on damages.

*Id.* at 118–19, 122 S.Ct. 2061.

29. Unless the evidence regarding the commencement of the running of the statute of limitations is so clear that the court can rule on the issue as a matter of law, the jury should decide the issue on appropriate instructions.

is, between December 8, 1992 and December 8, 1993. If she meets these requirements, it does not matter if an initial portion of the conduct took place outside the limitations period.

■ Here, as alleged by Ms. Lively and established at trial, FPA's and Mr. Braswell's unlawful employment practice of maintaining a hostile work environment consisted of using offensive, insulting and demeaning language about women; engaging in actions with sexual overtones that humiliated women; and not only criticizing the communications skills of Ms. Lively and other female employees when they complained about Mr. Braswell's and Mr. Thornburg's sexually based language and actions, but also taking steps inimical to Ms. Lively's FPA employment status.

The evidence presented to the jury on behalf of Ms. Lively showed that in 1987, two incidents with sexual overtones took place at FPA; one occurring around January 1987, involved a male stripper who disrobed provocatively before Ms. Lively on her birthday while Mr. Braswell took pictures and laughed. The second concerned a limousine scene months later, in mid-December 1987, during which Mr. Thornburg pulled Ms. Lively into the car and tried to get her to sit on his lap because he wanted to look down her cleavage. Other incidents also occurred. Mr. Braswell and Mr. Thornburg repeatedly referred to women in 1987 as "bimbos, hookers, prostitutes, old maids, dykes, and girls," and used the words "boobs" and "asses" in describing female body parts. However, Mr. Braswell gave Ms. Lively a positive performance evaluation, including an assessment of her communication skills as "developed." In addition, Mr. Thornburg promised around October 1987 that, "I will not do it again," when Ms. Lively confronted him with the complaints from Ms. Greig and Ms. Gray about his behavior.[30]

In 1988, Mr. Braswell and Mr. Thornburg continued to use offensive language about women, but no overt actions of a sexual nature were reported by female FPA employees. However, Mr. Braswell

---

**30.** By themselves, some of these incidents may have constituted "a few isolated incidents," *Daka, Inc., supra,* 711 A.2d at 93, and thus were insufficient in and of themselves to make out a claim for a hostile work environment. *See Woodland v. Ryerson & Son, Inc.,* 302 F.3d 839, 844 (8th Cir.2002) (hostile work environment claim dismissed because "sporadic racially-motivated misconduct by [plaintiff's] co-workers was 'neither severe nor pervasive enough to create a hostile work environment and because the employer responded "to those incidents of co-worker harassment that were brought to management's attention"); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000) ("Incidents that are 'few in number' and that occur 'over a short period of time' may fail to demonstrate a hostile work environment."); *see also Burnett v. Tyco Corp.,* 203 F.3d 980, 981 (6th Cir.2000) (plaintiff's hostile work environment claim did not survive a summary judgment motion despite three incidents that occurred during one year:

male personnel manager of plaintiff's employer "placed a pack of cigarettes containing a lighter inside [her] tank top and brassiere strap"; personnel manager offered plaintiff a cough drop and said: "Since you have lost your cherry, here's one to replace the one you lost"; personnel manager said to plaintiff as she walked by: "Dick the malls, dick the malls, I almost got aroused.").

Furthermore, use of offensive language, by itself, may also be insufficient to establish a hostile work environment. *See Burnett, supra,* 203 F.3d at 983 (citing *Black v. Zaring Homes, Inc.,* 104 F.3d 822 (6th Cir.1997), *cert. denied,* 522 U.S. 865, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997)) (where the court said that calling a woman a "broad"; accusing her of being at a biker bar and dancing on the tables; referring to a preference for "sticky buns" in the morning; and use of "Titsville," over a four-month period, amounted to "merely offensive" language, which was insufficient to support a jury verdict in a hostile work environment claim).

began to criticize the communications skills of Ms. Kaplan and Ms. Lively. In the same performance evaluation document in which he rated Ms. Kaplan's communications skills as "below standard" or "unacceptable," he labeled Ms. Kaplan as "a source of staff disruption and discontent ... [because she] [r]eported to [the] President [of FPA] allegations of sexual harassment of members of her department and others by another staff member," which he personally investigated and determined to be "unfounded." And, although he had described Ms. Lively's communication skills as "developed" in 1987, Mr. Braswell concluded that they "need[ed] development" in 1988.

When the year 1989 began, the FPA Board intervened. Mr. Braswell was called before the Compensation and Personnel Committee of the FPA Board on January 9, 1989, and confronted by his actions and those of Mr. Thornburg relating to female FPA employees, including their use of offensive language and Mr. Braswell's disparaging comments about the competence of women. Significantly, the Chairman of the Personnel and Compensation Committee, Mr. McFarlane, read a statement to Mr. Braswell which included the following: "You appear to have a tendency to demean women and their abilities, at the same time advancing and promoting the career of [Mr.] Thornburg."

After the FPA Board intervened, a change in Mr. Braswell's attitude toward Ms. Lively occurred in January 1989. He reacted angrily to his meeting with the Board, called Ms. Lively a "liar" and accused her of taking her complaints directly to the FPA Board, rather than to him in the first instance. Ms. Lively engaged an attorney in February, and a letter was sent to FPA's legal counsel and the chairman of the Board. FPA's counsel met with Ms. Lively, her counsel and two FPA employees. And, in early 1989, the Board sent Mr. Braswell to the Farr Institute for management and communications training.

The Board continued to monitor Mr. Braswell from 1990 until around May or June 1992. Ms. Gness, who had walked out of a bar, leaving Mr. Braswell and Mr. Thornburg there, when they began flirting with a waitress and to joke about a lingerie show scheduled to start later, and who heard FPA pregnant women called "preggers" and other female employees "bimbos," complained to the FPA Board in 1990 about Mr. Braswell's negative performance evaluation of her, including his criticism of her writing skills. Mr. Braswell also criticized Ms. Lively's communications skills in 1990, and the FPA Board again confronted Mr. Braswell about his treatment of her. Mr. Woolford, the FPA Board chairman at that time, placed restrictions on Mr. Braswell, ordering him not to discipline or criticize Ms. Lively. Significantly, during the FPA Board's monitoring and restriction of Mr. Braswell in 1989, 1990, and 1991, neither he nor Mr. Thornburg made any direct, inappropriate, discriminatory, harassing or abusive comments directly to Ms. Lively.

The atmosphere at FPA began to change in 1992. In February 1992, Mr. Thornburg made a comment about always seeing Ms. Lively on her knees and the talk at the barbershop about her being in this position.[31] After Mr. West removed the restriction in May or June 1992, that had been placed on Mr. Braswell by Mr.

---

31. A similar comment was made about another female FPA employee by Mr. Thornburg. Female employees interpreted the remark as an indication that the women were on their knees for the purpose of oral sex.

Woolford, other incidents occurred, including: (1) the July 1992 comment by Mr. Thornburg, in Mr. Braswell's presence, that an FPA female employee should put on a short skirt and stand in the aisle of a trade show event so that state legislators could be lured to FPA's exhibit booth; (2) an October 1992 inquiry by Mr. Braswell of a male seated at the head of a conference table at an out-of-state staff meeting, as to whether he had been "in [Ms. Lively's] room [the previous] night conducting membership business"; and (3) the December 11, 1992, comment by Mr. Braswell that a female FPA employer was "the dumbest girl I've ever seen."

On December 11, 1992, after he had placed two October 1992 letters from others in her personnel file as examples of her allegedly deficient communications skills, Mr. Braswell called Ms. Lively into a meeting with him, in the presence of FPA's legal counsel. At that meeting, he read to Ms. Lively a letter which not only criticized her communications skills, but also instructed her to report to the Kingsbury Center, which specialized in learning disabilities or brain dysfunctions of children. There she was to submit to "a battery of diagnostic tests" which could result in her "reassign[ment] to a lower level of responsibility within the FPA ..., with an appropriate reduction in salary ...." The letter also informed Ms. Lively that she would be placed on probation for six months. Later, Mr. Braswell indicated that the start of Ms. Lively's probationary period and her "training" would be postponed until she returned after her recuperation from her Fall 1992, hip surgery, but his January 19, 1993, letter re-emphasized the necessity of diagnostic testing by a professional since "diagnostic testing is the key to defining the proper solution ...." Ms. Lively had been working for

FPA from her home, after her November 1992 surgery, and continued to do so until March 1993. She was scheduled for more surgery on July 8, 1993, FPA and Mr. Braswell sent her a letter warning that if she did not return to work at the FPA office by July 15, 1993, she would be fired. Through her attorney, she "ask[ed] for additional time," but "[n]o additional time was granted." Ms. Lively testified that she "had to be in the office by July 15th." In response to her attorney's question at trial as to whether "Mr. Braswell or anyone at FPA ever allow[ed][her] to continue to do the job from home as [she] had [been doing], Ms. Lively responded: "No, I was not provided that. I had to be in the office because that's what this letter of June 11 says, I have to be in the office to do the job." She explained that she "could have done the job from home because 90 percent of my recruitment and retention [of members] was done by telephone, and that's what I was doing at home." Nevertheless, she was terminated and replaced by Mr. West who then worked part-time for FPA for over a year from his home in North Carolina.

In light of the evidence presented at trial, and the reasonable inferences to be drawn therefrom, reasonable jurors could conclude that Ms. Lively had proved a hostile work environment claim consisting of "a series of related acts, one or more of which [fell] within the limitations period," *Doe, supra,* 624 A.2d at 444-45 n. 5. That pattern of behavior involved not only derogatory and offensive words used by Mr. Braswell and Mr. Thornburg to describe FPA female employees and other women, but also their offensive treatment of FPA women, coupled with Mr. Braswell's tendency to demean women by criticizing their communication skills when they complained about the harassing, hostile, and

humiliating work environment.[32] Reasonable jurors could regard these comments and incidents as part of one "unlawful employment practice," even though there were gaps in the occurrence of the acts constituting the hostile work environment claim, *Morgan, supra,* 536 at 118, 122 S.Ct. 2061. Therefore, we vacate the trial court's judgment as to Ms. Lively's hostile work environment claim and remand with instructions to reinstate the jury liability verdict and the compensatory damage award for that claim.

### Punitive Damages

The remaining question is how shall the punitive damages issue be resolved. Since the jury verdicts concerning three of Ms. Lively's four causes of action were not sustained on appeal, punitive damages related solely to the remaining claim should be considered for excessiveness (if the parties do not settle the matter). For that reason, we remand to the trial court with instructions to consider the reasonableness of punitive damages on the remaining claim against both defendants and to remit the excess portion.[33] If Ms. Lively, at her option, declines to accept punitive damages as remitted, then she shall be granted a new trial solely on the issue of punitive damages related to her hostile work environment claim.

Accordingly, for the foregoing reasons, we reverse the judgment of the trial court, with respect to the hostile work environment claim and remand the case to the trial court for action consistent with this opinion.[34]

*So ordered.*

---

**32.** The perception that women employed by FPA have deficient skills was summarized by Ms. Gness: "Women were referred to as bimbos. It was sort of entities without any real substance, airheads." In addition, Mr. McFarlane's 1989 statement to Mr. Braswell asserted, in part: "You appear to have a tendency to demean women and their abilities, at the same time advancing and promoting the career of [Mr.] Thornburg."

**33.** We note that it appears that the jury awarded punitive damages against FPA on a dollar for dollar basis relative to the total awarded in compensatory damages for all four claims. In determining the amount to be remitted, this dollar for dollar congruity provides an appropriate consideration, along with the other factors related to an assessment of reasonableness of a punitive damages award. *See e.g. State Farm Mut. Auto. Ins. v.*

*Campbell,* ——— U.S. ———, ———, 123 S.Ct. 1513, 1520, 155 L.Ed.2d 585 (2003).

**34.** Mr. Braswell and FPA make two additional arguments relating to evidence introduced at trial. They challenge the trial court's decision "permitt[ing] Dr. Bernice Sandler to testify as an 'expert in the field of sexual harassment.' " They also question the trial court's admission of evidence about "incidents involving other women." As Ms. Lively points out, appellees did not note an appeal regarding these issues, and they are not properly before us. *See Edwards v. Woods,* 385 A.2d 780, 783 (D.C.1978). At any rate, decisions regarding the admission, relevancy and materiality of evidence rest within the sound discretion of the trial court. *See Mayberry v. Dukes,* 742 A.2d 448, 452 (D.C.1999); *Freeman v. United States,* 689 A.2d 575, 580 (D.C. 1997).