**PSYCHIATRIC INSTITUTE OF WASHINGTON, Petitioner,**

v.

**DISTRICT OF COLUMBIA COMMIS-SION ON HUMAN RIGHTS, Respondent.**

**Ric BIRCH, Intervenor/Cross–Petitioner.**

No. 03–AA–804, 03–AA–825.

District of Columbia Court of Appeals.

Argued Oct. 5, 2004.

Decided March 31, 2005.

R. Mark Dare, with whom Bridnetta D. Edwards was on the brief, Washington, for petitioner.

Patricia A. Smith, with whom Dale Edwin Sanders was on the brief, for intervenor/cross-petitioner.

Robert J. Spagnoletti, Attorney General for the District of Columbia, Edward E. Schwab, Deputy Attorney General, and Mary T. Connelly, Assistant Attorney General, filed a statement in lieu of brief for respondent.

Before FARRELL and REID, Associate Judges, and STEADMAN, Senior Judge.*

FARRELL, Associate Judge:

The Psychiatric Institute of Washington and National Medical Enterprises (collectively, PIW) seek review of a final decision and order of the District of Columbia Commission on Human Rights awarding Ric Birch over $900,000 in compensatory damages, plus attorneys' fees and costs. PIW contends that the Commission improperly considered evidence of retaliation in awarding Birch damages for his sexual harassment-hostile work environment claim, and that the damage award was unreasonable and not warranted by the facts. Birch cross-appeals contending that the Commission should not have reduced

the hearing examiner's larger recommended compensatory damage award. For the reasons that follow, we affirm.

## I. Background

On September 27, 1993, Birch, a homosexual man formerly employed by PIW, filed a complaint under the District of Columbia Human Rights Act[1] with the predecessor to the current Office of Human Rights alleging discrimination by PIW on the basis of gender and sexual orientation. The claim stemmed from the conduct of a supervisory PIW employee, Brenda Harris. The Office investigated Birch's claims and issued a Letter of Determination stating that Birch had presented sufficient evidence to establish probable cause for a finding of sexual harassment-hostile work environment, but not a finding of sexual orientation discrimination.

After the Human Rights Commission assigned the case to a hearing examiner, PIW stipulated to liability and agreed to adjudicate the issue of damages only. Specifically, PIW and Birch agreed that:

1. Complainant's Supervisor[,] Brenda Harris, made comments of a sexual nature and engaged in behavior of a sexual nature towards Plaintiff in the manner identified in his deposition testimony.

2. Ms. Harris' comments and behavior, taken in total, are sufficient to constitute sexual harassment, and Respondents are liable for the comments and behavior of Ms. Harris.

On the issue of damages, the hearing examiner issued a proposed decision and order finding that Birch had incurred and still suffered from a major depressive dis-

* Judge Steadman was an Associate Judge, Retired, at the time of argument. His status changed to Senior Judge on October 18, 2004.

1. D.C.Code § 2-1401.01 *et seq.* (2001) (DCHRA).

order as a result of the admitted sexual harassment, and recommended an award of $1,134,426.53 in compensatory damages, plus attorneys' fees and costs.

A Commission panel issued a Final Order and Decision on July 1, 2003, incorporating the stipulation that PIW had unlawfully discriminated against Birch by creating a hostile work environment through sexual harassment. The Commission further agreed with the finding of a major depressive disorder stemming from the sexual harassment, but reduced the proposed damages award for that permanent mental condition from $900,000 to $700,000. It also reduced the damages for embarrassment and humiliation caused by sexual harassment from $150,000 to $50,000, but increased the embarrassment and humiliation damages for adverse treatment Birch had received after complaining of the sexual harassment from $50,000 to $150,000.

## II. The Evidence

### A. Liability

After the evidentiary hearing, and in partial keeping with the parties' stipulation, the Commission adopted the following relevant findings by the examiner regarding the sexual harassment. PIW had hired Birch as a clinical coordinator in 1986. Following promotions, he was working as an intake therapist in the fall of 1991 when he met Brenda Harris, who was his new second-line supervisor and a department head. Although she knew he was gay, Harris continually made sexual advances toward Birch. She typically would approach him at the end of his shift (the night shift), sit on his desk in a manner that made her short skirt rise, and call him "honey" and stroke his hair. Occasionally Harris sat so close to Birch that their knees would bump, and Birch would try to move away because he felt uncomfortable. During these encounters and also during staff meetings, Harris frequently stared at Birch's crotch. She also called him on the telephone two to three times a week during his work shift. In the calls she would discuss her personal and sexual affairs, referring to sexual content and innuendo and hinting that she was naked, wet, or masturbating. At least one of these telephone conversations was witnessed—at Birch's end and to his embarrassment—by one of his co-workers. Harris told another co-worker that she thought Birch simply needed the "right woman" to realize he was straight. She said that Birch appeared sick, implying that he had AIDS.

Both the morning meetings and the late-night conversations continued until Harris left her job with PIW in October 1992. They were accompanied by other acts of harassment. One day Harris walked into Birch's office waiving a document she said was PIW's new sexual harassment policy. She grabbed his buttocks, groped him, giggled, and said "I guess I'm not supposed to do that." She told Birch that homosexuals should be hospitalized "because of what she saw as their inherent problem[s]" and said "you look like you're strong and high functioning, but if you scratch the surface you're very fragile." Harris told Birch that "family members and friends of gays should be allowed access to patient treatment because of the loss that they suffer when someone comes out to them and it's devastating to their lives."

Birch felt embarrassed and ashamed during the encounters with Harris, and by the spring of 1992 he found the situation was causing him loss of sleep, anxiety, and feelings of depression. In March, he decided to tell Debbie Draper, Harris's supervisor, about her behavior toward him. Draper referred him to Marie O'Donnell, the Director of Human Resources. Birch

met with O'Donnell, told her what Harris was doing, and asked for her help. O'Donnell replied that she would fix the situation but warned Birch that if he filed a formal complaint, the hospital would vigorously defend Harris. Birch met with O'Donnell again in April and said that Harris's behavior had not improved. O'Donnell, citing a need for confidentiality, would not say if she had spoken with Harris. In August 1992, Birch saw O'Donnell again and told her that the situation had become worse and that it seemed that nothing had been done. O'Donnell offered no further assurances or assistance, and never conducted an investigation of Birch's allegations.

Sometime after complaining to Draper and O'Donnell, Birch and his coworkers noticed a change in Harris's attitude towards Birch. She was more hostile and more critical of his work, although she continued with improper sexual behavior, especially the sexually suggestive meetings and telephone calls. Harris's changed attitude—which Birch believed and the Board concluded was traceable to Birch's speaking with O'Donnell (and O'Donnell's presumed speaking with Harris)—resulted in heightened criticism of his performance at work. Harris tried to make him attend afternoon staff meetings and work on a rotating shift, requiring him to work some days and some nights during the work week, which disrupted his sleep pattern. She made a number of protocol changes applicable to Birch but no other employee, and frequently asked him basic, demeaning questions as well as criticizing him in front of colleagues. Harris tried to transfer Birch to a different unit in the hospital and asserted that he should not have been hired by PIW. When Harris left PIW in October 1992, Birch began to feel comfortable again at the hospital. He was laid off the next month, however, with three other employees from his unit.

## B. Damages

Besides documenting the sexual harassment, the Commission made findings with respect to the damages Birch had suffered. During the period in which he worked with Harris, Birch felt a loss of energy and appetite and had problems sleeping. He had nightmares in which he would kill Harris, and during his waking hours he thought about running her over with his car. In June 1992, Birch began talking with a psychotherapist and seeing a physician who prescribed a series of anti-depressants. Birch's current physician, Dr. Storer, whom he began seeing in 1994, diagnosed him as having a "major depressive disorder, severe, recurrent" and permanent in nature, that was precipitated by Harris's conduct and would require him to take anti-depressants for the rest of his life. PIW's expert, Dr. Simon, admitted that Birch had five of the nine DSM IV diagnostic criteria indicating a major depressive disorder and that major depression is a common result of sexual harassment. He agreed with Dr. Storer that sexual harassment was the "triggering" cause of Birch's symptoms. The Commission found also, based on the medical testimony, that Birch's symptoms were not due to any other stressors such as being gay or "coming out" to his family. At the time of the hearing, Birch was still taking antidepressants to combat his symptoms, with moderate success. The Commission concluded that, while Birch's mental state and quality of life were now better than they had been during the period of harassment, he remained less stable and happy than he was before meeting Brenda Harris.

## III. Discussion

### A. Statute of Limitations

We briefly address, and reject, PIW's argument made for the first time on

review that Birch's claim for sexual harassment was barred by the DCHRA's one-year statute of limitations. Having conceded liability, PIW cannot now raise the defense of limitations. *Mayo v. Mayo*, 508 A.2d 114, 116 (D.C.1986) ("failure to plead the limitation defense results in a waiver thereof"); *see also Hahn v. University of the Dist. of Columbia*, 789 A.2d 1252, 1257 (D.C.2002). Moreover, Birch's claim was timely filed. A hostile work environment claim by its "very nature ... involves repeated conduct ... based on the cumulative effect of individual acts"; thus, to satisfy limitations only "one 'act contributing to the claim' [need] occur within [the statutory period]." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 889, 892 (D.C.2003) (quoting *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Birch's testimony demonstrated that Harris's sexually improper behavior continued until she left PIW in October 1992, placing at least several weeks of this conduct within one year of September 27, 1993, when he filed his claim. The claim therefore fell within the statutory period.

## B. Damages

### 1.

PIW argues that the Commission committed legal error by considering Harris's retaliatory conduct in awarding Birch damages for the sexual harassment-hostile work environment claim. By "retaliatory conduct" PIW means Harris's negative treatment of Birch after he complained of her conduct to O'Donnell and Draper—her heightened criticism, attempts to interrupt his sleep schedule, and other acts fairly characterized as retaliation for his report-ing Harris to the human resources staff. These actions, PIW argues, could only be considered under a separate claim for retaliation, which Birch did not make, but not as an element of damages in a sexual harassment-hostile work environment claim. The argument is not well-taken.

▬ Conduct need not, of course, be overtly sexual to contribute to a sexual harassment-hostile work environment claim. *See McKinney v. Dole*, 246 U.S.App. D.C. 376, 385, 765 F.2d 1129, 1138 (1985) ("We have never held that sexual harassment or other unequal treatment of an employee [must] ... take the form of sexual advances or of other incidents with clearly sexual overtones."); *Bailey v. Henderson*, 94 F.Supp.2d 68, 75 (D.D.C.2000) ("There is not ... a requirement that [the victim] demonstrate ... that the conduct ... was 'sexual or romantic come-ons.'"). Rather, all adverse conduct is relevant so long as it would not have taken place but for the gender of the alleged victim. *See Williams v. General Motors*, 187 F.3d 553, 565 (6th Cir.1999) ("Any unequal treatment of any employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the Harris[2] standard, constitute a hostile environment."); *Hirase–Doi v. U.S. West Communications Inc.*, 61 F.3d 777, 784 n. 3 (10th Cir.1995) (same). Further, although PIW conceded liability, complainants typically must demonstrate employer failure to discipline and restrain the conduct of harassing subordinates in order to establish vicarious liability for hostile work environment claims. *See, e.g., Daka, Inc. v. McCrae*, 839 A.2d 682, 689 (D.C.2003) (*Daka II*). In this case, the reasonableness of PIW's re-

---

**2.** *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (applying Title VII). We generally follow Title VII analysis in discrimination cases brought un-der the DCHRA. *See RAP, Inc. v. District of Columbia Comm'n on Human Rights*, 485 A.2d 173, 176 (D.C.1984); *Lively*, 830 A.2d at 887.

sponse to Birch's complaint could partly be determined by examining how or whether Harris's behavior changed after Birch's complaint. *See Henderson v. Whirlpool Corp.,* 17 F.Supp.2d 1238, 1245 (N.D.Okla. 1998) ("The employer is, of course, obliged to respond to any repeat conduct; and ... [r]epeat conduct may show the unreasonableness of prior responses."). Harris's combination of inappropriate sexual conduct and retaliatory adverse treatment after Birch's complaint helped demonstrate the inadequacy of PIW's response, and thus was relevant to both liability and damages.

■ More directly to the point, conduct retaliatory in nature is relevant to a hostile work environment claim whether or not it would support a separate statutory retaliation claim, so long as the claimant does not recover under both claims for the same conduct. *Cf. Estate of Underwood v. National Credit Union,* 665 A.2d 621, 640–41 (D.C.1995) (evidence supporting hostile work environment claim could also support separate claim for emotional distress provided plaintiff was "limited to one recovery").[3] In *Lively, supra,* this court implicitly held, for statute of limitations purposes, that a harassing employer's retaliatory non-sexual criticism given in response to an employee's complaint of sexual harassment was part of a continuous course of harassing conduct. *See* 830 A.2d at 895–96. Other courts interpreting Title VII of the 1964 Civil Rights Act and state statutes resembling the DCHRA have regularly considered retaliatory conduct as part of sexual harassment-hostile work en-

vironment claims. *See, e.g., Birschtein v. New United Motor Mfr., Inc.,* 92 Cal. App.4th 994, 1003, 112 Cal.Rptr.2d 347 (2001) (for purpose of establishing timely hostile work environment claim, "apparent retaliatory acts were sufficiently allied with the prior [sexual] acts of harassment to constitute a continuing course of unlawful conduct"); *Henderson v. Whirlpool Corp.,* 17 F.Supp.2d at 1244 ("threatening stares taken as a result of complaints about sexual harassment can also constitute illegal sexual harassment ... [and] might, in certain circumstances, also be conduct sufficient to form the basis of a retaliation claim") (internal quotation marks deleted); *Hirase–Doi,* 61 F.3d at 784 n. 3 ("threatening stares ... in apparent retaliation for the complaints about ... sexual harassment[ ] were sufficiently related to the prior alleged sexual harassment that they could be found to constitute continuing sexual harassment").

■ The Commission did not err, therefore, by considering non-sexual retaliatory evidence in awarding damages for the proven sexual harassment-hostile work environment. In considering hostile work environment claims, a factfinder must examine the totality of the circumstances, including " 'the amount and nature of the conduct, the plaintiff's response to such conduct, and the relationship between the harassing party and the plaintiff,' " *Daka, Inc. v. Breiner,* 711 A.2d 86, 93 (D.C.1998) (*Daka I* ) (quoting *Howard Univ. v. Best,* 484 A.2d 958, 980–81 (D.C.1984)). The Commission could not have engaged in this

---

**3.** It is clear that the Commission did not award damages based on a finding of statutory retaliation. *See* D.C.Code § 2–1402.61 (2001). To demonstrate such retaliation, the complainant must prove that " '(1) [he] was engaged in a protected activity, or that [he] opposed practices made unlawful by the DCHRA ...; (2) ... [the employer] took an adverse personnel action against [him]; and (3) a causal connection existed between the two.' " *Daka II,* 839 A.2d at 689–90 (quoting *Howard Univ. v. Green,* 652 A.2d 41, 45 (D.C. 1994)). The Commission did not purport to determine whether Harris's conduct met the test for an adverse personnel action against Birch.

analysis without also considering Harris's post-complaint adverse treatment of Birch.

### 2.

■■■■ PIW challenges the Commission's compensatory damage award for (1) embarrassment, humiliation, and indignity resulting from sexual harassment ($50,000) and adverse treatment ($150,000); and (2) mental and physical anguish, pain and suffering ($700,000). Our "review of ... [a DCHRA] award of compensatory damages is limited and highly deferential," *United Mine Workers v. Moore*, 717 A.2d 332, 339 (D.C.1998) (internal quotation marks omitted); we will reverse the award only "if the agency's action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Joel Truitt Mgmt. v. District of Columbia Comm'n on Human Rights*, 646 A.2d 1007, 1010 (D.C. 1994) (quoting D.C.Code § 2–510(a)(3)(E) (2001)). A compensatory damages award must be upheld unless it is "well beyond the reasonable range ... [,] which might be awarded in a case such as the one at bar." *Id.* (quoting *Louison v. Crockett*, 546 A.2d 400, 404 (D.C.1988)).

■■■■ Birch's damages for embarrassment, humiliation, and indignity are fully substantiated in the Commission's decision. Under the DCHRA Guidelines for Payment of Compensatory Damages, "embarrassment, humiliation, and indignity" are considered the "natural and unavoidable consequences" of unlawful discrimination. 4 DCMR § 211.1 (2004). The Commission also must consider aggravating factors including: (1) "sexual ... epithets regarding the complainant"; (2) "[o]ccurrence of the unlawful discriminatory acts ... publicly, or within the knowledge of the awardee's family, friends, peers, or acquaintances"; and (3) "[w]illfullness,

recklessness, or repetition of the unlawful discriminatory acts or practices of the respondent to the extent that they constituted harassment ...." 4 DCMR § 211.2. As the Commission found, Harris's conduct toward Birch was degrading and humiliating. She demeaned homosexuals in general and Birch in particular, characterizing them as needing inpatient hospital treatment, and Birch as soft and fragile because of his homosexuality. And she abused her supervisory authority by subjecting him to repeated telephone conversations—multiple times a week for several months—about her sexual behavior. At least one of the phone calls was overheard by a co-worker, as was her frequent criticism of Birch after he complained of the harassment. The phone calls, the open and repeated crotch-staring, and her groping of Birch's buttocks were all conduct that could be considered willful and reckless. The Commission faithfully applied the guidelines in awarding these damages.

### 3.

■■■■ PIW's principal grievance, however, is with the award of $700,000 to a victim who suffered no direct physical trauma from the harassment and whose mental injury, while affecting the quality of his life, was conceded by his physician not to have been disabling.[4] Sizeable damage awards for pain and suffering such as this one frequently draw the charge of arbitrariness, and some courts frankly acknowledge that "there is no rational scale that justifies the award of any particular amount as opposed to some very different amount in compensation for a particular quantum of pain." *Nyman v. FDIC*, 967 F.Supp. 1562, 1570 (D.D.C.1997) (quoting *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1009 (2d Cir.1995)). The Commission's own guidelines, neverthe-

---

**4.** Birch sought no economic damages as a result of the discrimination.

less, require that awards for "mental and physical anguish [and] pain and suffering" be supported by "competent medical evidence thereof." 4 DCMR § 210.[5] On the record of this case, we are satisfied that the Commission's award is supported by such evidence. The Commission credited expert medical testimony that Birch suffered from a major depressive disorder which even PIW's medical expert conceded was precipitated by the sexual harassment. Of particular importance to the Commission was the medical finding that the condition was permanent. Birch had been diagnosed with major depression in 1992 after suffering repeated nightmares and homicidal ideation directed toward Harris. Although he received medication in the succeeding years, with moderate success, he still possessed the disorder at the time of the hearing in 1999, and his physician's opinion was that he would have to continue medication for the rest of his life. The Commission could fairly conclude that this ongoing need for treatment would diminish his ability to lead a normal life well into the future, as it had done for most of the past decade.

▮ In sum, as a result of the harassment, Birch was afflicted with what the Commission found to be a serious and permanent mental disease that would require lifelong treatment and was only in remission. While the award was nominally for pain and suffering, these were a concomitant of the "permanent injury" and "permanent damage" (the Commission's words) that he suffered in his mental condition from a medically diagnosed disease. For this reason, PIW's comparison of the award here to, for example, the far lesser award of $187,500 we upheld in *Daka II,* 839 A.2d at 692 & n. 10, for emotional injury spanning a far shorter length of time (months only) is inapt. As this case illustrates, awards claimed to be excessive "should not be measured strictly on a comparative basis," since " 'each case in this area necessarily rises or falls on its own facts.' " *Daka I,* 711 A.2d at 100 (citation omitted).[6] The award of $700,000 to Birch, though troublesome in its size, did not exceed the inevitably imprecise limits of a "reasonable range" of compensation, *Louison, supra,* for the permanent injuries demonstrated here.

### C. Cross–Petition

▮ Finally, Birch argues that the Commission lowered his mental injury award from the amount proposed by the hearing examiner (from $900,000 to $700,000) without stating its reasons for doing so. In *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625 (D.C.1989), we held that when the

---

5. The Commission's formal order awarded the $700,000 for the "mental and physical anguish, pain and suffering caused by the unlawful act of discrimination," using the language of section 210. As shown by the Commission's discussion, however, this language was used in the context of the infliction of permanent mental injury.

6. That is not to say that the Commission should not aim for, and demonstrate through analysis, consistency among damage awards in similar cases made either by itself or by comparable authorities. As we have stated elsewhere, "Our deference [in the area of administrative law] reflects the statutory authority entrusted to an agency to regulate a certain sphere of public activity and the notion that an agency's experience and expertise *will produce a pattern of reasonably consistent decisions* concerning questions that arise within its jurisdiction." *Majerle Mgmt. Inc. v. District of Columbia Rental Hous. Comm'n,* 866 A.2d 41, 46 (D.C.2004) (emphasis added). If, as apparently in this case, the Commission's own past awards provide little basis for comparison among relevant decisions, it should not hesitate to look to the actions of other antidiscrimination bodies, federal or state, for guidance.

Commission departs from *credibility* findings by the hearing examiner, it must state the reasons why. *Id.* at 630. We further explained, however, that the "decision-making process of the Commission [does] ... not have the character of a hierarchical system in which the hearing examiner makes an initial decision which is followed by an internal agency appeal. Rather, the hearing examiner makes a *recommended* decision, but the *final* decision is made by the Commission." *Id.* (emphasis in the original). This is not a case where the Commission's reduction in the award implied disagreement with any of the examiner's credibility findings; rather it exercised its responsibility to guard against awards inflated beyond what the circumstances would justify. The Commission had no obligation under *Harris* to explain its entry of a lesser amount.

*Affirmed.*