Telahun NICOLA, Appellant,

v.

The WASHINGTON TIMES CORPORATION, et al.,
Appellees.

No. 06–CV–1334.

District of Columbia Court of Appeals.

Argued March 12, 2008.

Decided May 15, 2008.

Jerry R. Goldstein, for appellant.

Allen V. Farber, with whom Laurie A. Holmes and Courtney R. Abbott were on the brief, for appellees.

Before FISHER and BLACKBURNE–RIGSBY, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

Telahun Nicola (appellant) sued his former employer, News World Communications, Inc.[1] (appellee) alleging three violations of the District of Columbia Human Rights Act:[2] (1) discrimination on the basis of religion, (2) subjection to a hostile work environment, and (3) retaliation for complaining about perceived discriminatory treatment. The trial court denied News World's motion for summary judgment, but after hearing Nicola's evidence, the court granted News World's motion for a directed verdict on all three claims. It found only a "speculative" connection between "the claim of religious discrimination" and the adverse employment actions

taken against Nicola. The court also awarded costs and fees to the employer. On appeal, Nicola argues that the trial court erred in both respects. We affirm the grant of a directed verdict, but reverse and remand with respect to the award of certain costs and fees to News World.

### I.

News World hired Nicola in March 1997 as its Engineering and Operations Manager in the Facilities Department. As one of his duties he prepared conference rooms for meetings of the Unification Church held in News World's buildings. Indeed, News World has strong ties to the Unification Church. Dong Moon Joo, President of its subsidiary, The Washington Times Corporation, is a Unification Church member. The Reverend Sun Myung Moon, founder and head of the Unification Church, has an office in one of News World's corporate buildings. And Nicola's immediate supervisor, Richard Oben, the company's Director of Facilities, is also a Church member. Other members of the Unification Church with whom Nicola interacted included James Borer, who served as News World's human resources director, in-house counsel, and corporate secretary, and his wife, Lucille Borer, employed as administrative assistant to Richard Amberg, News World's Vice President and General Manager (who was not a member of the Unification Church).

During his tenure at News World, Nicola was commended for his industriousness and praised for his individual accomplishments. He received an employee of the year award in May 2003, and his performance evaluations were largely favorable. However, following a series of incidents

---

1. News World publishes *The Washington Times* newspaper and owns the Washington Times Corporation. The Washington Times Corporation initially was a defendant in this case but was voluntarily dismissed before trial.

2. D.C.Code § 2–1402.11 *et seq.* (2001).

with his supervisors and subordinates, Nicola was fired in October 2003. He contends that he lost his job for two principal reasons: he rejected Lucille Borer's invitation to attend a Unification Church blessing ceremony in New York City, and he impeded efforts to hire and promote another Unification Church member, Kevin Quinn, whom Nicola considered unqualified.[3]

As to the first incident, Nicola testified at trial that in the summer of 2001, Lucille Borer called him to her office to invite him and his wife to attend the New York blessing ceremony. She told Nicola that she and her husband would accompany them and stand by their sides during the blessing. Nicola understood this ceremony to be a mass marriage presided over by the head of the Unification Church, and he believed that his attendance would have made him a member of the Church. Nicola replied that he would discuss the invitation with his wife. Lucille Borer followed up the invitation by calling Nicola at home and leaving a message on the answering machine. Nicola called Borer at home and told her that he and his wife would not be able to attend, as they had to accompany their son to a golf tournament. Nicola testified that after he had rejected the invitation, he was treated differently at News World. Lucille Borer, for example, began to call him to complain about facility maintenance problems, something that she had not done before. And Washington Times president Dong Mong Joo, who had previously been friendly toward Nicola, began to treat him indifferently and ignore him.

Nicola then testified that the reactions of his superiors to his resistance to hiring and promoting of Kevin Quinn, a Unification Church member, as well as their responses to his efforts to discipline Quinn, provide further evidence that his employment termination was the result of religious discrimination. Nicola said that although he usually had significant autonomy in filling vacant positions within his department, Oben had instructed him to re-hire Quinn as a building technician. (Quinn had resigned in 1992 from a job with News World.) Nicola believed that Quinn was unqualified for the position and pointed out to Oben various irregularities in his hiring. On his employment application, Quinn had listed as his minimum desired wage an amount higher than the wage paid the prior incumbent—a violation of News World's corporate policy for new hires. After Nicola called Oben's attention to that policy, Oben obtained approval from the finance department to pay Quinn the higher wage, and Quinn was re-hired in December 2000. Nicola further testified that later his own signature was forged, and the date altered, on personnel action forms used to award Quinn a raise. Eventually, when Nicola's assistant resigned, Oben urged him to promote Quinn to that position. Nicola insisted that Quinn was not qualified to serve as his assistant, and the position was filled by someone else.

Nicola, in his testimony and written memoranda, contends that Quinn, upon starting work, began to foment trouble in the Facilities Department by acting disre-

---

3. Nicola also points to other incidents involving the Unification Church that took place during his time at News World. Earlier, in 1997, at Richard Oben's invitation, Nicola had attended a Unification Church blessing ceremony at R.F.K. Stadium. He testified that he had attended the ceremony out of curiosity but had stayed for only a short time because he felt uncomfortable. Nicola also testified that James Borer often talked to him about the Unification Church, and that Lucille Borer, sometime before inviting Nicola to the New York City blessing, had given him holy water and asked him to drink it.

spectfully to Nicola and encouraging other employees to do the same, bragging to co-workers about his friendship with Oben, failing to complete assigned jobs, sleeping on the job, and writing memoranda to Nicola on which Oben was copied, accusing Nicola of being a liar. Nicola stressed that, in spite of this misconduct, Oben would not allow him to discipline Quinn. Moreover, aside from Quinn's on-the-job performance, Nicola was aggrieved by a series of personal confrontations with Quinn that took place in 2003. Nicola testified that after an argument between the two men that took place in the company van, Quinn slammed the door and, in the process, injured Nicola's ear. Nicola further testified that in a meeting he had attended with Oben and Quinn, Quinn read a memorandum to Oben berating Nicola, after which Oben verbally attacked Nicola. Nicola also testified that a few days after this meeting, Quinn confronted him in the company parking lot and challenged him to a fight. Nicola recorded his recollection of the incident in a memorandum and, after consulting with Amberg (the Vice President and General Manager), he issued Quinn a written warning, even though Oben and Borer had discouraged this course of action.

Around the time of these confrontations with Quinn, Nicola was experiencing other difficulties with his employment. In June 2003, he said, Oben and Borer told him to attend a team-building seminar and listen to a series of related audio tapes. Nicola initially refused, writing a memorandum highly critical of his supervisors in which he explained that he did not believe he needed to attend the seminar. Nicola ultimately attended the seminar and listened to the tapes, but Amberg—called by Nicola as a witness—testified that he believed Nicola's initial, pointed refusal to attend the seminar was insubordination, and that he would have terminated Nicola's employ-

ment at that time had Oben not insisted that the dispute could be resolved.

Nicola received a performance evaluation dated July 30, 2003, in which he was praised for his work ethic and his individual performance, but he was criticized for poor management and team leadership. Nicola responded to the evaluation in writing, contesting portions of the evaluation with which he disagreed and criticizing his supervisors. Even before this evaluation, Nicola had written two memoranda to James Boren detailing his disagreements with Oben. In them, he claimed that Oben had: undermined his performance by interfering with his communications with those in other departments and with outside contractors; encouraged unrest among his staff; and sent a complaint to the human resources department based on a false allegation that Nicola had mistreated a subordinate. Although Nicola initially did not send the memoranda, he gave them to Borer after the incident with Quinn that took place in the corporate van. Nowhere in the memoranda did Nicola allege that his maltreatment was the product of religious discrimination. In response to these memoranda, Borer instructed Nicola that he should work with Oben to resolve their difficulties.

Nicola's problems at work intensified in October of 2003. Oben issued him a written warning for insubordination after Nicola threatened to walk out of a meeting and accused Oben of pressuring Ricardo Monzon, one of Nicola's subordinates, to change Monzon's explanation of events leading to correction of a power outage. The warning put Nicola on notice that "any further repetition of insubordinate behavior will result in disciplinary measures including suspension or termination." Ten days later, Nicola received an e-mail warning from Oben, who had learned that Nicola had tape-recorded conversations be-

tween Oben and other employees. Four days after Nicola received this e-mail, Oben suspended him for one week without pay for insubordination after receiving "several reports" that Nicola had threatened physical violence against him and made vulgar remarks about him in conversations with other employees.

During his period of suspension, Nicola wrote to Amberg, informing him that he believed he was a victim of discrimination and that he was being maltreated because of his refusal to attend the blessing ceremony in New York (in 2001). He claimed that Oben, Quinn, and James Borer were harassing him, and he outlined specific incidents that he believed supported his claim. Amberg testified that he had suggested to Nicola that Lucille Borer's invitation to the blessing had been a friendly gesture, and that she had assured Amberg that it would not be repeated. And Amberg wrote a memorandum to Nicola in which he advised him to follow directions from his manager and focus on fostering a spirit of teamwork in the Facilities Department upon his return to work.

After serving his suspension, Nicola was involved in a dispute with two of his subordinates, Ricardo Monzon and Ricky Savoy, concerning the repair of a men's room urinal. According to Monzon's written report, he had been working on a plumbing repair when Nicola came into the room and began to berate him and question him about Monzon's personal activity logs. Monzon left the men's room and returned with Savoy, at which point Nicola, according to Monzon, adopted an aggressive posture and accused the two men of conspiring against him. Believing that Nicola wanted to start a fight with him, Monzon testified that he had been extremely upset by the incident and threatened to leave the company. On October 29, 2003, the day of the incident with Monzon, Amberg fired Nicola. Amberg testified that this deci-

sion was attributable to "a culmination of a series of things."

Nicola filed suit against The Washington Times Corporation and News World in Superior Court, alleging that his employers had violated the D.C. Human Rights Act, *supra* note 2, by discriminating against him on the basis of religion, creating a hostile work environment, and retaliating when he complained of being a victim of religious discrimination. The case was tried before a jury, and after Nicola had presented his evidence, the trial court granted News World's motion for a directed verdict. The trial judge acknowledged that Nicola had been "treated badly" at work, but he concluded, after hearing all the evidence, that "no reasonable juror could find by a preponderance of the evidence that there was any religious connection to these actions. The jury would have to speculate about that." The judge also awarded News World costs, including sums associated with depositions, filing fees, photocopying fees, and witness fees and travel costs.

## II.

### A. Standard of Review

 When we review the grant of a directed verdict, we use the same test that the trial court applied and view the evidence in the light most favorable to the non-moving party. *Insurance Co. of North Am. v. GMR, Ltd.,* 499 A.2d 878, 881 (D.C.1985). Thus, all reasonable inferences from the evidence are drawn in favor of the non-moving party. *Abebe v. Benitez,* 667 A.2d 834, 836 (D.C.1995). "As long as there is some evidence from which jurors could find that the [non-moving] party has met its burden, a trial judge must not grant a directed verdict." *Id.* See also *Washington Metro. Area Transit Auth. v. Bell,* 632 A.2d 414, 415 (D.C.1993) (explaining that "[w]hile normally the jury

is the trier of fact, a trial court may 're-move from jury consideration those cases in which the facts, viewed most favorably to the nonmoving party, permit but one reasonable conclusion as to the proper judgment' ") (internal citations and quotations omitted). A directed verdict "is proper 'if during a trial by jury [the plaintiff] has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for [her].' " *Evans–Reid v. District of Columbia*, 930 A.2d 930, 936 (D.C.2007) (quoting *Burke v. Maryland Auto Ins. Fund*, 879 A.2d 996, 996 n. 1 (D.C.2005)).

## B. *Appellant's Individual Claims*

The District of Columbia Human Rights Act (DCHRA), *supra* note 2, was enacted to "secure an end ... to discrimination for any reason other than that of individual merit[.]" D.C.Code § 2–1401.01 (2001). Part B of the DCHRA, D.C.Code § 2–1402.11 *et seq.*, pertains to prohibited acts of discrimination in employment. Subsection 2–1402.11(a)(1) makes it an "unlawful discriminatory practice" for an employer to "discharge[ ] any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment" for a reason that, in whole or in part, is discriminatory and "based upon the actual or perceived ... religion ... of any individual." [4] In enacting the DCHRA, the Council of the District of Columbia examined federal civil rights acts and court decisions interpreting those statutes. *See*

*Benefits Commc'n Corp. v. Klieforth*, 642 A.2d 1299, 1304 n. 16 (D.C.1994). When cases require interpretation of the DCHRA, this court has "generally looked to cases from the federal courts involving claims brought under the Civil Rights Act of 1964 for guidance and have adopted those precedents when appropriate." *Id.* at 1301.

### 1. *Religious Discrimination*

■■■ Nicola claims that News World discriminated against him because of his refusal to accept overtures to join the Unification Church, and also because of his resistance to hiring and promoting a candidate, Quinn, who was a member of the Church. For this kind of claim, our analysis differs from the one we employ in more conventional discrimination cases in which the plaintiff claims discrimination based on membership in a protected class, namely, someone of a minority race, a particular gender, a specified religion, an advanced age, or other category expressly protected by the DCHRA. *See supra* note 4 and accompanying text.[5] The United States Court of Appeals for the Tenth Circuit has explained that when "discrimination is not targeted against a particular religion, but against those who do not share a particular religious belief, the use of the protected class factor is inappropriate." *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1038 (10th Cir.1993). The plaintiff in *Shapolia* claimed that his employment had been terminated because he did not hold

---

4. The other discriminatory practices forbidden under subsection 2–1402.11(a)(1) of the act pertain to "race, color, ... natural origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, genetic information, disability, matriculation, or political affiliation."

5. To establish a prima facie case of discrimination in a case based on membership in a

protected class, a plaintiff must show that: (1) he is "a member of a protected class"; (2) he "was qualified for the job from which he was terminated"; (3) his "termination occurred despite his employment qualifications"; and (4) his membership in the protected class was "a substantial factor in his termination." *Hollins v. Federal Nat'l Mortgage Ass'n*, 760 A.2d 563, 572 (D.C.2000).

the religious beliefs of his supervisor, a Mormon. *Id.* at 1037. For that plaintiff to establish a prima facie case of discrimination, the *Shapolia* court held that he must show

 (1) that he was subjected to some adverse employment action;

 (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs.

*Id.* at 1038. If the plaintiff makes a prima facie case of discrimination, then the three-part, burden-shifting test articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies.[6] *Id.*

With respect to the first criterion, Nicola's job termination was inherently an "adverse employment action." *See Davis v. Gables Residential /H.G. Smithy*, 525 F.Supp.2d 87, 100 (D.D.C.2007) (explaining that "termination clearly constitutes an adverse employment action"). However, he did not meet the second, "satisfactory performance" criterion. Although Nicola had won recognition for his individual efforts at News World, there is no record basis for a finding that he had been a satisfactory supervisor at the time his employment was terminated. Nicola's superiors advised him on numerous occasions that he needed to work on delegating tasks to his subordinates and on improving the morale within his team. Nicola had been combative when Borer and Oben instructed him to attend a team-building seminar (Nicola acknowledges that refusal of a supervisor's instruction is insubordination); and Amberg, News World's Vice President and General Manager, considered Nicola's conduct at that time to be insubordinate enough for termination (although Amberg deferred to the desire of Nicola's immediate supervisor, Oben, to keep Nicola on the job to try to resolve matters). Four months later, Nicola received a written warning for being insubordinate to Oben by threatening to walk out of a meeting (he admitted this), and, ten days after that, he received an e-mail warning for tape-recording Oben's conversations with other employees (admitted but claimed inadvertent). After another ten days, Nicola was suspended for a week for insubordination—in particular, for making vulgar remarks and physical threats directed against Oben (denied). He was fired on the day of his altercation with Monzon and Savoy (altercation admitted).

 On this record, we agree with the trial judge that any finding of a religious motive for these employer actions, especially in light of Nicola's admissions, would have been speculative. A directed verdict was appropriate on Nicola's claim of religious discrimination, therefore, because no reasonable juror could have found that his job performance was satisfactory at the time his employment was terminated—a

---

**6.** The *McDonnell Douglas* framework requires that the plaintiff first establish a prima facie case of discrimination, which then "raises a rebuttable presumption that the employer's conduct amounted to unlawful discrimination." *Hollins*, 760 A.2d at 571. The burden of production then shifts to the employer, who can rebut the presumption of discrimination by articulating " 'some legitimate, nondiscriminatory reason for the employment action.' " *Id.* (internal citation omitted). Lastly, if the employer makes that showing, the burden of production returns to the employee, who—in retaining the burden of persuasion, no longer with benefit of the presumption—must prove by a preponderance of the evidence that the employer's stated reason for the adverse action was a pretext intended to disguise discrimination. *Id.*

prerequisite for a prima facie case under the *Shapolia* test.

## 2. *Hostile Work Environment*

 We have said that, to prevail on a hostile work environment claim under the DCHRA, a plaintiff must establish "(1) that he is a member of a protected class, (2) that he has been subject to unwelcome harassment, (3) that the harassment was based on membership in a protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment." *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C.1998). The harassment must consist of " '[m]ore than a few isolated incidents [,] ... and genuinely trivial occurrences will not establish a prima facie case.' " *Id.* at 93 (quoting *Howard Univ. v. Best*, 484 A.2d 958, 978 (D.C.1984)). In evaluating such a claim, the factfinder must "focus on 'all the circumstances,' including 'the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance.' " *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 890 (D.C.2003) (en banc) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). The plaintiff must also demonstrate that his work environment was objectively and subjectively hostile. *Id.* at 889.

 Because the DCHRA establishes " 'the right to work in an environment free from discriminatory intimidation, ridicule, and insult[,]' " *Daka*, 711 A.2d at 97 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)), it is critical that, in bringing a hostile work environ-

ment claim, the plaintiff establish *discriminatory* harassment. In this case, the source of the alleged harassment of Nicola is limited to religious discrimination. Furthermore, this is a reverse discrimination case, meaning—as in *Shapolia*—that Nicola allegedly was targeted not as a member of a protected class,[7] but for *not* holding the same religious beliefs as his employer representatives.

For analytical purposes, therefore, as to the first, class membership criterion, courts have tended to " 'assume away' the protected class requirement" and substitute a burden on the plaintiff to " 'establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority.' " *Shapolia*, 992 F.2d at 1038 n. 6 (quoting *Notari v. Denver Water Dept.*, 971 F.2d 585, 589 (10th Cir.1992)); *accord Johnson v. Dong Moon Joo*, No. Civ. A 01–0004 CKK, 2006 WL 627154, at *22 (D.D.C. Mar.12, 2006). Solely for the sake of argument, in view of the close relationship between News World and the Unification Church, we shall assume that this substitution criterion is met. And we shall also assume, again only for argument's sake, that Nicola has satisfied criteria two and four; *i.e.*, that he has been "subject to unwelcome harassment," and that it was "severe and pervasive enough to affect a term, condition, or privilege of employment." *Daka*, 711 A.2d at 92.

 That leaves criterion three. In a reverse discrimination case, in lieu of showing that the harassment was based on membership in a protected class, the plaintiff must show that the alleged harassment would not have taken place but for his status as a non-member of the Unification

---

7. Because Nicola does not claim discrimination directed at his own religion, he is not a member of a class expressly protected by the DCHRA. *See supra* note 4 and accompanying text.

Church. *See Psychiatric Inst. of Wash. v. District of Columbia Comm'n on Human Rights,* 871 A.2d 1146, 1151 (D.C.2005) (when sexual harassment is alleged, "all adverse conduct is relevant so long as it would not have taken place but for the gender of the alleged victim"). Nicola contends that because of his rejection of Lucille Borer's invitation to attend the New York blessing and his unwillingness to give preferential treatment to one of his subordinates, Kevin Quinn, a member of the Church, he was harassed at work, with discriminatory religious motivation, by three Church members.

First, he wrote to Amberg that once he had turned down Lucille Borer's invitation to attend the New York blessing (tantamount to joining the Church), she began to complain to him—for the first time—about facility maintenance problems. (Nicola acknowledged at trial, however, that the invitation to the blessing ceremony was not unwelcome at the time.) Second, he testified that his immediate supervisor, Richard Oben, harassed him in various ways—more specifically, by discouraging him from disciplining his subordinate, Quinn; by blaming Nicola for causing morale problems; by making false allegations that he had mistreated another subordinate, Ricky Savoy; by interfering with Nicola's communications with other departments and outside contractors; by making negative comments about his work in a performance appraisal and then forcing him to delete his comments in response; by soliciting negative comments about him

from his subordinates; and by instigating discipline against Nicola, including his suspension and ultimately his termination. Finally, Nicola testified that Quinn was insubordinate, called him names, and physically threatened him.

Nicola, however, has failed to show that the harassment he endured would not have taken place but for his status as a nonmember of the Unification Church. We have reviewed the entire record and, like the trial judge, are convinced that the inferences of religious discrimination that Nicola proffered as the source of harassment are simply too speculative for a reasonable jury to have drawn. The evidence suggests that the treatment Nicola experienced was a product not of discriminatory animus based on religion but, rather, the result of "personal conflicts between plaintiff and [his] co-workers and/or supervisors." *Nichols v. Truscott,* 424 F.Supp.2d 124, 140 (D.D.C.2006) (holding that plaintiff failed to establish prima facie case of hostile work environment under Title VII because she did not establish connection between her membership in protected class and harassment she endured).[8] In sum, Nicola did not provide a legally sufficient evidentiary basis that would allow a reasonable jury to find that the harassment he experienced was motivated by religious animus, the alleged cause of the hostility.

### 3. *Retaliation*

▮▮▮ Nicola claims, finally, that his employment had been terminated in retali-

---

**8.** In contrast, previous cases of alleged harassment based on membership in a protected class have reflected hostile actions sufficiently direct for a reasonable jury to have found a discriminatory hostile work environment. In *Daka,* for example, we observed that the harassing conduct by plaintiff's co-workers was based on plaintiff's age and evidenced by "repetitive age-based slurs." 711 A.2d at 96–97. And in *Lively,* the harassing

actions included the company president's "using offensive, insulting and demeaning language about women, engaging in actions with sexual overtones that humiliated women," and criticizing the communication skills of female employees after they complained of sexually-based language and actions by the president and a company director. 830 A.2d at 893.

ation for engaging in a protected activity, that is, for complaining to Amberg that he was the victim of religious discrimination. Under the DCHRA, for a prima facie case of retaliation, the plaintiff must establish that "(1) she was engaged in a protected activity, or that she opposed practices made unlawful by the DCHRA; (2) the employer took an adverse personnel action against her; and (3) a causal connection existed between the two." *Howard Univ. v. Green,* 652 A.2d 41, 45 (D.C.1994). The evidence here was sufficient for a jury to find that Nicola had satisfied these three criteria.

As to the first, Nicola claims, correctly, that the memorandum he wrote to Amberg during his suspension, in which he complained that he was the victim of discrimination, was protected activity. We have said that protected activity includes " 'informal complaints of discrimination to [one's] superiors within the organization.' " *McFarland v. George Washington Univ.,* 935 A.2d 337, 356 (D.C.2007) (quoting *Carter–Obayuwana v. Howard Univ.,* 764 A.2d 779, 790–91 (D.C.2001)). As we noted above, moreover, termination constitutes adverse personnel action, *see Davis, supra,* 525 F.Supp.2d at 100, and thus Nicola has also satisfied the second criterion under Green.

■ The third *Green* criterion for a prima facie case, "causal connection," is also met. We have held that an employee may establish the causal connection between the adverse employment action and the protected activity by " 'showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.' " *McFarland,* 935 A.2d at 356 (internal citation omitted). Nicola sent Amberg a facsimile copy of his memorandum on October 21, 2003, and his employment was terminated nine days later on October 30. The Supreme Court has said that in cases where a plaintiff seeks to establish causation by pointing to the temporal proximity between protected activity and adverse employment action, "the temporal proximity must be 'very close[.]' " *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal citation omitted). Not long ago, in *Carter–Obayuwana,* we concluded that appellant had established a causal connection between protected activity and adverse employment action when she complained to her superiors about sex discrimination two days before her salary was reduced. 764 A.2d at 793. The United States Court of Appeals for the District of Columbia Circuit has held that a temporal proximity of "a few weeks" between protected activity and adverse employment action is sufficient to support an inference of a causal nexus between the two events. *Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 339 U.S.App.D.C. 354, 357, 199 F.3d 1365, 1368 (2000). Here, we are satisfied that the nine day gap between appellant's protected activity and his job termination is sufficient to establish the causal connection required for a prima facie case.

■ Under the *McDonnell Douglas* framework, therefore, the burden of production shifts to the employer and we must look to its proffered non-discriminatory reasons for terminating Nicola's employment. *See Hollins,* 760 A.2d at 571. News World articulated legitimate reasons for Nicola's termination. Moreover, at this stage of the inquiry it " 'need not persuade the court that it was actually motivated by the proffered reasons.' " *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). To the contrary, Nicola must establish that News World's stated reasons for terminating him were false—a pretext—and that " 'discrimina-

tion was the real reason.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Appellant has not met this burden.

■ Although he points to his rejection of the invitation to the Unification Church blessing in 2001, over two years before he was fired, and his refusal, more recently, to provide Quinn with preferential treatment, that evidence was not sufficient for a reasonable jury to have found that his job termination was retaliatory, based on discriminatory religious animus. Nor was there additional evidence to help create a critical mass from which the jury could reasonably have found retaliation. To the contrary, from June 2003, when Nicola initially refused to attend a team-building seminar and incurred Amberg's ire, to October 2003, when Oben gave Nicola a warning for insubordinate acts he does not deny and then a suspension for further insubordination, the evidence points overwhelmingly to unsatisfactory job performance warranting termination. Nicola's retaliation claim, therefore, also must fail.[9]

\* \* \* \* \* \*

Viewing the evidence in the light most favorable to Nicola, we must conclude that his evidence was legally insufficient for a reasonable jury to have found in his favor

on any of his three claims of religious discrimination. Accordingly, we can discern no basis for disturbing the verdict the judge directed at the end of plaintiff's case.

## III.

Nicola challenges the trial court's order awarding costs to News World, specifically deposition costs, filing fees, photocopying fees, and witness fees. Super. Ct. Civ. R. 54(d) gives trial judges discretion to award costs to the prevailing party, and an award of costs may be overturned only if we find an abuse of discretion. *Talley v. Varma,* 689 A.2d 547, 555 (D.C.1997).

■ As an initial matter, News World concedes that the award of $500 in witness fees for the appearance of Ronald Clarke was improper because News World failed to comply with Super. Ct. Civ. R. 54(I)(a).[10] Next, as a general matter, "[d]eposition costs are specifically delineated as taxable at the court's discretion under Super. Ct. Civ. R. 54–I." *Harris v. Sears Roebuck & Co.,* 695 A.2d 108, 110 (D.C.1997). The deposition does not have to be used at trial, but the court must "'find that the deposition was necessary for case preparation.'" *Id.* (quoting *Kleiman v. Aetna Cas. & Sur. Co.,* 581 A.2d 1263, 1267 (D.C.1990)). Moreover, "[c]op-

9. The trial judge granted the motion for a directed verdict for lack of a prima facie case because he was unable to find a nexus between Nicola's job termination and religion. As explained above, however, in order to make a prima facie case of retaliation, Nicola was not required to introduce evidence demonstrating that his job termination had been motivated by a discriminatory reason. Because we review de novo, we may affirm the trial court's ruling on the alternative ground that, in response to News World's proffered non-discriminatory reasons for the termination, Nicola did not meet his burden of proving pretext. *See Kerrigan v. Britches of Georgetowne, Inc.,* 705 A.2d 624, 628 (D.C. 1997) (explaining that "[a]s a reviewing court,

we are not limited to reviewing the legal adequacy of the grounds the trial court relied on for its ruling;" if there is an alternative basis that dictates the same result, a correct judgment must be affirmed on appeal.)

10. Super. Ct. Civ. R. 54–I(a) provides: *Witness fees.* Proof of the attendance of witnesses shall be by certificate of the attorney of record in the form prescribed in CA Form 104. The certificate must be served upon the opposing party or counsel and filed within 5 days after the entry of any final order or judgment, otherwise witness fees shall not be taxed or recovered as costs. Within 5 days after the certificate is served any party may move to amend or strike the same.

ies of depositions are taxable upon a showing of 'necessity to the preparation of one's case.' " *Id.* (quoting *Bennett v. Kiggins,* 391 A.2d 236, 238 (D.C.1978)). In evaluating whether an award of deposition costs is proper, the trial judge " 'must determine whether all or any part of a copy of any or all of the deposition was necessarily obtained for use in the case.' " *Kleiman, supra,* 581 A.2d at 1267 (citation omitted). Nicola has failed to show that the trial court failed to do its job properly and thus abused its discretion in awarding deposition costs.

▪ Similarly, appellant has not shown that the trial court's award of photocopying fees was an abuse of discretion. We have noted that "the prevailing party may recover the cost of obtaining and copying records and other material necessary for case preparation and presentation." *Talley,* 689 A.2d at 555. News World submitted a bill of costs that included $690.15 in photocopying fees claimed necessary for the pretrial conference, including preparation of the joint pretrial statement and its preparation for trial. The trial judge found this amount reasonable and we cannot say that he abused his discretion.

▪ The bill of costs also included $205 in filing fees. Court filing fees are taxable as a matter of course. *Id.* We agree with Nicola, however, that the trial court abused its discretion in awarding News World the filing fee for a *pro hac vice* motion, filed to enable a Chicago-based attorney to represent News World in this matter. "[A]bsent unusual circumstances, the parties must bear their personal expenses[.]" *Robinson v. Howard University,* 455 A.2d 1363, 1368 (D.C. 1983). The filing fee for a *pro hac vice* motion is "an expense of counsel for the privilege of practicing law in this Court." *Romero v. United States,* 865 F.Supp. 585, 594 (E.D.Mo.1994). "Such expenses are not normally charged to a fee-paying client" and so are not recoverable as costs. *Id. See also Cathey v. Sweeney,* No. CV205–202, 2007 WL 1385657, at *1 (S.D.Ga. May 8, 2007); *Sheffer v. Experian Info. Solutions, Inc.,* 290 F.Supp.2d 538, 552 (E.D.Pa.2003); *Schmitz–Werke GmbH Co. v. Rockland Indus., Inc.,* 271 F.Supp.2d 734, 735 (D.Md.2003); and *Liquid Dynamics Corp. v. Vaughan Co., Inc.,* No. 01–C–6934, 2002 WL 31207212, at *1 (N.D. Ill. Oct 2, 2002).

\* \* \* \* \* \*

The trial court's entry of a directed verdict in favor of News World is affirmed. We remand the case to the trial court, however, for recalculation of the award of costs consistent with this opinion.

*So ordered.*